```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------- x
ANTHONY CHARLOT, ALAN REMACHE and  :
JOSE TEJADA, individually and on   :
behalf of all others similarly    :
situated,                          :
                                   :   MEMORANDUM AND ORDER
                Plaintiffs,        :
                                   :   No. 12 Civ. 4543 (KAM)(VMS)
        -against-                  :
                                   :
ECOLAB, INC.,                      :
                                   :
                Defendant.         :
-------------------------------- x
```

**MATSUMOTO, United States District Judge:**

The named plaintiffs Anthony Charlot, Alan Remache, Jose Tejada, Gregory Germuska, Garwyn Richmond, Matt Riggs, and Christopher Hendley (collectively, the "Named Plaintiffs" or "plaintiffs")[1] bring this individual, collective, and class action against Ecolab, Inc. ("defendant") for alleged violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*; the New York Labor Law, N.Y. Lab. Law §§ 650 *et seq.*, and its supporting regulations, N.Y. Comp. Codes R. & Regs. tit. 12, § 142 (collectively, the "New York Wage Laws"); the New Jersey

---

[1] On March 27, 2015, the court adopted Judge Scanlon's Report and Recommendation, and granted plaintiffs' motion for leave to amend (ECF No. 122), permitting plaintiffs to add four additional named plaintiffs and their individual and class claims under North Carolina, Illinois, Washington and Pennsylvania state laws. Plaintiffs filed an Amended Complaint on April 6, 2015, adding Gregory Germuska, Garwyn Richmond, Matt Riggs, and Christopher Hendley as named plaintiffs and their respective federal and state law claims. (ECF No. 201.) Because the Amended Complaint was filed after summary judgment motions had been fully briefed in December 2014, the parties' motions and this Memorandum and Order specifically address only the claims by the original named plaintiffs, Anthony Charlot, Alan Remache, and Jose Tejada.

Wage-and-Hour Laws. N.F.S.A. §§ 34:11-56a *et seq.*, its supporting regulations, N.J. Admin. Code §§ 12:56-1.1 *et seq.*, and the New Jersey Wage Payment Law, N.J.S.A. §§ 34:11-4.1-33.6 (collectively, the "New Jersey Wage Laws"); the Pennsylvania Minimum Wage Act, 43 Pa. Stat. § 333.101 *et seq.*, and the Pennsylvania Wage Payment and Collection Law, 43 Pa. Stat. § 260.1 *et seq.* (collectively, the "Pennsylvania Wage Laws"); the Illinois Minimum Wage Law, 820 Ill. Comp. Stat. § 105/1, *et seq.*, the Illinois Wage Payments and Collections Act, 820 Ill. Comp. Stat. §§ 115/1, *et seq.*, and their implementing regulations, 56 Ill. Admin. Code §§ 210.100 through 300.850 (collectively, the Illinois Wage Laws); the Washington Minimum Wage Act, Rev. Code Wash. §§ 49.46.005 *et seq.*, the Washington Industrial Welfare Act, Rev. Code Wash. §§ 49.12.005 *et seq.*, and the Washington Wage Rebate Act, Rev. Code Wash. §§ 49.52.050 *et seq.*, and Washington Administrative Code §§ 296-126-092 and 296-126-050 (collectively, the Washington Wage Laws); and the North Carolina Wage and Hour Act, N.C. Gen. Stat. § 95-25.1, *et seq.*, and implementing regulations, 13 N.C. Admin. Code 12.0300, *et seq.* (collectively, the North Carolina Wage Laws).

On December 22, 2014, defendant Ecolab moved for summary judgment and the plaintiffs cross-moved for partial summary judgment on the limited issues of defendant's affirmative defenses to overtime liability under the FLSA. (ECF

Nos. 160-183.[2])  Presently before the court are the parties'
cross-motions for summary judgment on whether plaintiffs, as
Route Managers, Route Sales Managers, or Service Sales Route
Managers for defendant-employer Ecolab, were (1) exempt
employees under the FLSA as either: "outside salesmen," pursuant
to 29 U.S.C. § 213(a)(1); or (2) "commissioned salespersons,"
who have been properly compensated under the FLSA, pursuant to
29 U.S.C. § 207(i) (the "7(i)" defense).

I.    **BACKGROUND**

    A.    **Procedural Background**

       On September 11, 2012, plaintiffs Charlot, Remache,
and Tejada commenced this putative collective and class action,
bringing individual and representative claims on behalf of
themselves and all other similarly situated Ecolab employees,

---

[2] In support of its Motion for Summary Judgment, defendant submitted the following: ECF Nos. 160, Defendant's Motion for Summary Judgment; 161, Defendant's Rule 56.1 Statement in Support of its Motion for Summary Judgment; 162, Memorandum of Law in Support of its Motion for Summary Judgment; 163, Declaration of John Lassetter; 164, Declaration of Michael Ahearne, Ph.D.; 165, Declaration of Charles Melnyk; 166, Declaration of Douglas Moechnig; 167, Declaration of John Myers; 168, Supplemental Declaration of Charles Melnyk; 169, Supplemental Declaration of Douglas Moechnig; 170, Supplemental Declaration of John Myers; 175, Defendant's Reply in Support of its Motion for Summary Judgment and in Opposition to Plaintiffs' Cross-Motion for Summary Judgment; 176, Defendant's Opposition to Plaintiffs' Rule 56.1 Statement; 177, Reply Declaration of Charles Melnyk; 178, Reply Declaration of John Myers; and 179, Reply Declaration of John Ybarra.  In support of its Cross-Motion for Partial Summary Judgment, plaintiffs submitted the following: ECF Nos. 171, Plaintiffs' Motion for Partial Summary Judgment; 172, Plaintiffs' Rule 56.1 Statement in Support of its Cross-Motion for Partial Summary Judgment; 173, Memorandum of Law in Support of its Cross-Motion for Partial Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment; 174, Declaration of Michael J.D. Sweeney; and 180, Plaintiffs' Reply Memorandum in Further Support of its Cross-Motion for Partial Summary Judgment.  The parties also filed a Joint Deposition Appendix.  (ECF No. 181, Joint Deposition Appendix.)

alleging that defendant Ecolab failed to pay its Route Managers, Route Sales Managers, and Service Sales Route Managers overtime for hours worked over forty hours per week in violation of the FLSA and pertinent state overtime and wage laws.  On April 6, 2015, plaintiffs filed an amended complaint to add four additional named plaintiffs and their respective state class claims.  (ECF No. 201, Amended Complaint ("Amend. Compl.").)

Plaintiffs bring their FLSA overtime wage claim on behalf of themselves and on behalf of a putative Section 216(b) FLSA collective class.[3]  Pursuant to the FLSA, plaintiffs must opt-in to a collective action by filing written consent with the court.  29 U.S.C. § 216(b) (requiring employees affirmatively to consent to join a collective action).

Plaintiffs allege with respect to their federal claim that, as a part of its regular business practice, "Ecolab intentionally, willfully, and repeatedly engaged in a pattern, practice, and/or policy of violating the FLSA" by failing to record all the time that its employees worked, willfully failing to keep payroll records as required by the FLSA, willfully misclassifying the plaintiffs and the putative class members as exempt from the requirements of the FLSA, willfully failing to

---

[3] Plaintiffs also allege New Jersey, New York, Washington, Pennsylvania, North Carolina, and Illinois state law overtime claims on behalf of themselves and putative Rule 23 state law classes in those respective states.  The State Classes have not been certified under Federal Rule of Civil Procedure 23 and are not directly affected by this decision, which addresses only defendant's affirmative defenses to plaintiffs' FLSA claims.

pay plaintiffs and the putative class members earned wages, violating an agreement to pay overtime to all employees that are not exempt from the requirements of the FLSA and willfully failing to pay its employees, including plaintiffs and the putative class members, overtime wages for hours that they worked in excess of 40 hours per week.  (Amend. Compl. ¶ 114.)

On March 11, 2014, the parties appeared for a pre-motion conference to discuss their proposed respective cross-motions for summary judgment and set a briefing schedule, advising the court that resolution of their motions would affect only the three named plaintiffs.[4]  (Minute Entry dated March 11, 2014.)  On March 18, 2014, at the request of the court, the parties submitted a joint letter clarifying that the parties had previously agreed to conduct limited discovery with respect to defendant's two affirmative defenses, pursuant to FLSA Sections 213(a)(1) and 207(i), and that plaintiffs would not seek class certification under FLSA Section 216(b) until summary judgment on the defendant's affirmative defenses had been resolved.  (ECF No. 89, Joint Letter dated 3/18/14.)

The parties' cross-motions for summary judgment were fully-briefed and filed on December 22, 2014.  (*See* ECF Nos. 160-182.)  On July 10, 2015, the parties presented oral argument on their cross-motions for summary judgment.  Following the oral

---

[4] At this time, only Charlot, Tejada and Remache were named as plaintiffs, and neither the putative collective class nor state class had been certified.

argument, at the request of the court, each party submitted additional citations to evidence in the record in support of their arguments.  (ECF Nos. 217, Plaintiffs' Letter dated July 15, 2015; 218, Defendant's Letter dated July 17, 2015.)

On September 10, 2015, plaintiffs notified the court of the Honorable Edmond E. Chang's decision in the Northern District of Illinois, denying defendant Ecolab's motion for summary judgment in *Schneider v.* Ecolab, No. 14-CV-1044 (N.D. Ill. Sept. 3, 2015) and finding that plaintiff Schneider was not exempt as either an "outside salesman" or "commissioned salesperson" under Illinois Minimum Wage Law.  (*See* ECF No. 221, Plaintiffs' Letter re Decision in *Schneider*.)  Because the decision was filed under seal in the Northern District of Illinois, this court ordered defendant to obtain permission from Judge Chang and produce the decision and file it under seal in this action.  (Order dated 9/11/15.)  In addition, the court permitted the parties to submit limited submissions and replies regarding why Judge Chang's decision does or does not apply to the instant action.  (*See* ECF Nos. 224, Defendant's Letter re Unsealing of *Schneider*; 226, Defendant's Submission re *Schneider* dated 9/17/15; 227, Plaintiffs' Submission re *Schneider* dated 9/17/15; 235, Plaintiffs' Reply Letter dated 9/24/15; 236, Defendant's Reply Letter dated 9/24/15.)

**B.    Factual Background**

The following facts have not been specifically or directly disputed with admissible evidence unless otherwise noted.  Defendant Ecolab, Inc. sells cleaning, sanitizing, and food safety products, such as mops, floor mats and dish racks to a variety of businesses, primarily comprised of full service and fast food restaurants, and hospitality businesses, such as hotels and public facilities.  (Defendant's Rule 56.1 Statement of Undisputed Facts ("Def. 56.1") ¶¶ 5-6; Plaintiffs' Rule 56.1 Statement of Undisputed Facts ("Pls. 56.1") ¶ 1.)  Ecolab's cleaning and sanitizing solutions include products for ware-washing, housekeeping, and general sanitation chemicals, e.g., detergents, rinse-aids, sanitizers, and glass cleaners.  (Def. 56.1 ¶ 3; Pls. 56.1 ¶ 1.)  Ecolab also provides leases of dish and ware-washing machinery that include installation and regular maintenance services, which, under Ecolab's business model, serve as gateways for the sale of its cleaning products.  (Pls. 56.1 ¶¶ 1, 3-4, 6-10; Def. 56.1 ¶¶ 63-64; *see* Pls. 56.1 ¶ 231 (citing Declaration of Charles Melnyk in Support of Defendant's Motion for Summary Judgment ("Melnyk Decl.") ¶ 7); Defendant's Opposition to Plaintiffs' Rule 56.1 Statement of Undisputed Facts ("Def. Opp. Pls. 56.1") ¶¶ 1, 6.)

Plaintiffs were Route Managers ("RMs"), Route Sales Managers ("RSMs") or Sales Service Route Managers ("SSRMs") for

Ecolab's Institutional and PureForce divisions during the periods alleged in the complaint.[5]  (Def. 56.1 ¶¶ 86-90; Pls. 56.1 ¶¶ 2.)  Specifically, Charlot was an RSM between November 2009 and February 2011 in Ecolab's Institutional Division, Tejada was an RSM between January 2010 until March 2012 in Ecolab's Institutional Division, and Remache was an SSRM from February 2012 until February 2013 for Ecolab's PureForce division.  (Def. 56.1 ¶¶ 87-90; *see* Pls. 56.1 ¶ 2.)

     1.  <u>Ecolab's Business Model</u>

Ecolab employs a value-added sales model combining service and sales.  (Def. 56.1 ¶¶ 76-84 ("value-added selling").)  Value-added selling is premised on developing a relationship between the vendor and the customer through consistent and regular contact, and identifying and meeting the customer's needs through consultation between the customer and a sales person.  (Def. 56.1 ¶ 77.)  Plaintiffs admit that Ecolab's value-added sales model includes consistent and regular maintenance and repairs.  (Plaintiffs' Opposition to Defendant's Rule 56.1 Statement of Undisputed Facts ("Pls. Opp. Def. 56.1") ¶ 77.)

---

[5] The parties do not dispute that Sales and Service Managers, Route Managers, and Route Sales Managers have substantially the same job duties.  (Pls. 56.1 ¶ 72; Sweeney Decl. Exs. 1 (Charlot Decl. ¶ 4), 2 (Remache Decl. ¶ 4.), 3 (Tejada Decl. ¶ 4).)  Thus, for the purpose of this Memorandum and Order, the court will refer to plaintiffs as Route Sales Managers (RSMs) for convenience, unless the distinction is needed.

In addition to selling cleaning products to businesses in the restaurant and hospitality industries, Ecolab leases dish washing machines that are specially outfitted to dispense only Ecolab chemicals, and are provided to Ecolab's customers solely to support and encourage the purchase of Ecolab products. (Def. 56.1 ¶ 62-65; Pls. 56.1 ¶¶ 18-19.)  The dispensers are provided to Ecolab's customers at no charge. (Def. 56.1 ¶ 65.)  Ecolab's products – dishwashing machines and other warewashing equipment, as well as the chemical products used in conjunction with the equipment – are not sold for residential use. (Pls. 56.1 ¶¶ 270-71, 274; *see* Def. 56.1 ¶ 6.)

Ecolab's value-added organization uses multiple sales and marketing positions in a team effort to "push" sales opportunities to the primary sales representative whose role is to "pull through" the actual sale. (Def. 56.1 ¶¶ 81-82.) Although multiple team members are charged with Ecolab's sales functions, plaintiffs, as RSMs, are the "only ones" responsible for maintaining, servicing, and repairing dishwashing machines and equipment in their routes. (Pls. Opp. Def. 56.1 ¶ 81.) Ecolab uses two types of basic leases: (1) Phase I leases include service and repair of the leased equipment and sufficient chemical product to run loads as part of the lease price; and (2) Phase II leases require accounts to purchase certain dollar amounts of Ecolab products each month in addition

to a lease payment. (Pls. 56.1 ¶¶ 20-22; Declaration of Michael J.D. Sweeney in Support of Plaintiffs' Partial Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment ("Sweeney Decl.") Exs. 8-9.) Ecolab's leases require that the customer use only Ecolab approved products in the commercial leased equipment. (Pls. 56.1 ¶¶ 18-19.) Ecolab's leases also include a commercial dishwashing machine or related equipment as well as Ecolab's obligation to service and repair the commercial equipment, including installation, routine maintenance, emergency service coverage, replacement parts and repairs. (Pls. 56.1 ¶¶ 6-10, 73.) Ecolab provides these services to its customers for no additional fee beyond the lease payment for leased equipment. (Pls. 56.1 ¶ 14.)

Ecolab has two types of accounts: (1) independent operators, or "street" accounts and (2) corporate accounts. (Joint Appendix Ex. B, Deposition of John Myers ("Myers Depo.") Tr. 27:16-30:7.) Street accounts, though not an official name, refer to independent operators with one location or unit, whereas corporate accounts are multi-location customers that are owned or operated by a centralized management team. (*Id.;* Pls. 56.1 ¶¶ 28-29; Def. 56.1 ¶¶ 182-83.) Corporate Account Executives are part of the field sales team and negotiate contracts with the corporate account's centralized management. (Def. 56.1 ¶ 183; Pls. 56.1 ¶ 29.) Corporate Account Executives

also renegotiate corporate account contracts for plaintiffs'
accounts.  (Pls. 56.1 ¶ 71.)

        Ecolab also includes in its leases "product programs,"
or product purchase commitments, which consist of a group of
products needed to run the commercial dishwashing machines, such
as detergent, sanitizer, and rinse.  (Def. 56.1 ¶ 186; Pls. 56.1
¶ 24.)  Although it is undisputed that "product programs" may be
sold at the initial lease set-up, the parties dispute whether
the creation of a corporate account or "product program"
automatically guarantees purchases or sales of Ecolab products,
or whether customers have the opportunity to change, add, or
subtract products from the initial product program enlisted and
whether RSMs must call upon individual customers to make the
actual sale.  (Pls. 56.1 ¶¶ 25, 32-33; Def. 56.1 ¶¶ 186, 188-89;
Reply Declaration of Charles Melnyk in Opposition to Plaintiffs'
Motion for Summary Judgment ("Melnyk Reply Decl.") ¶¶ 23-25.)

        Ecolab's customers receive their products through two
methods: (1) from Ecolab directly or (2) through food and
product distributors that regularly deliver to the customer.
(Def. 56.1 ¶¶ 51-54.)  Customers may choose to receive their
Ecolab products from a food distributor, however some Ecolab
accounts may *require* customers to order through distributors.
(Pls. 56.1 ¶¶ 34, 39; Def. 56.1 ¶¶ 39, 51-54.)  Products
delivered by food distributors are called "indirect product

sales," whereas products delivered directly from Ecolab are called "direct sales." (Pls. 56.1 ¶ 40.) It is undisputed that approximately 50% of Ecolab's products are delivered by distributors. (Pls. 56.1 ¶ 289; Joint Appendix Ex. A, Deposition of Charles Melnyk ("Melnyk Depo.") Tr. 248:16-249:6.) Almost half of the Ecolab customers on Charlot's and Tejada's routes received Ecolab products from food distributors, and approximately half of Remache's routes received Ecolab products from food distributors. (Pls. 56.1 ¶¶ 42-43.)

The parties dispute whether Ecolab's transactions through distributors are merely a channel for delivery of Ecolab products or whether the transactions qualify as "resale" of Ecolab's goods for a profit, as discussed *infra* in Section II(A)(3)(b)(i). (Def. 56.1 ¶¶ 55-58; Pls. 56.1 ¶¶ 290-95.) There is no documentary evidence before the court that distributors are marking up and reselling Ecolab products. Defendant contends that in some instances, distributors received a "handling fee" or "delivery fee" for the goods they delivered, and in other instances, Ecolab permits distributors to "mark-up" Ecolab products to the end-user in lieu of a delivery fee. (Def. 56.1 ¶ 55-58.) Plaintiffs, on the other hand, assert that Ecolab sold its products to distributors to resell at a profit and requires distributors to complete a resale tax exemption

certificate.  (Pls. Mem. at 27; Pls. 56.1 ¶¶ 44-45, 189-90, 289-96; Pls. Opp. Def. 56.1 ¶ 52.)

    2.   Ecolab's Work Force

Ecolab employs various types of employees in its Institutional Division and PureForce Division.  Several titles are dedicated to selling leases and products to accounts and do not have service and repair responsibilities.  (Def. 56.1 ¶ 169; Pls. 56.1 ¶ 57.)  Included in the sales team are Territory Managers, Street Sales Development Managers, Distributor Sales Development Managers, District Managers, Account Executives, Sales Development Managers, and Corporate Account Managers.  (Def. 56.1 ¶¶ 169-70; Pls. 56.1 ¶ 52; Pls. Opp. Def. 56.1 ¶¶ 169-70.)  Territory Managers may do some service work, and are also responsible for selling leases to new customers, including product purchase agreements.  (Pls. 56.1 ¶ 58-60.)  Once a Territory Manager sells a lease, the account is assigned to an RSM.  (Def. 56.1 ¶ 174; Pls. 56.1 ¶¶ 61, 69.)

Ecolab also employs "Full Service Specialists," who are considered part of Ecolab's sales team, however they exclusively perform repairs and installation, and have no sales responsibility.  (Def. 56.1 ¶¶ 132-34; Pls. 56.1 ¶¶ 224.)  The parties dispute whether these Full Service Specialists provide assistance to Territory Managers exclusively, or if they also assist RSMs.  (Def. 56.1 ¶¶ 132-34; Pls. 56.1 ¶¶ 58, 81-83.)

The parties dispute the job responsibilities and role of the RSMs in sales and maintenance, as discussed below.

3.    RSMS' Job Responsibilities

Ecolab's RSMs spend most of their time engaged away from Ecolab's places of business in performing their jobs and were provided company vehicles to cover their routes. (Def. 56.1 ¶ 139.) Ecolab's RSMs are responsible for the installation, service, routine maintenance, and repair of dishwashing and warewashing machines at Ecolab's customer's establishments. (Pls. 56.1 ¶¶ 2, 72, 73; Def. 56.1 ¶¶ 93-94.) RSMs are required to make monthly Routine Preventative Maintenance (RPM) and, when requested, Emergency Service Request (ESR) calls for customers on their assigned accounts. (Def. 56.1 ¶¶ 93-94, 122; Pls. 56.1 ¶¶ 89, 105-06.) Plaintiff Charlot had between 100 and 120 assigned accounts on which he was required to make monthly RPM calls. (Pls. 56.1 ¶ 91.) Plaintiff Tejada had between 100 and 120 assigned accounts on which he was required to provide monthly RPM calls. (Pls. 56.1 ¶ 92.) Plaintiff Remache had approximately 120 assigned accounts on which he was required to make monthly RPM calls and 900 accounts for whom he had to respond to ESRs. (Pls. 56.1 ¶¶ 93-94.)

During an RPM, RSMs are expected to "perform maintenance work on the commercial dishwashing machines and

14

related equipment, including preparing for the call by reviewing the account's service history, checking and recording chemical ratios, checking for proper usage of ancillary products, checking the results of the dish machine, following a service protocol that includes disassembling and reassembling the machine, entering meter readings, titrating the chemicals and dispensers, recording results, training on products and machines, checking account inventory," and any "other service or repair work." (Pls. 56.1 ¶¶ 95-96; Def. 56.1 ¶¶ 93-94.) After each RPM, RSMs are required to produce a Service Detail Report ("SDR") for each RPM call and provide a copy to the customer. (Def. 56.1 ¶ 114; Pls. 56.1 ¶¶ 98-99, 132.) SDRs record the "account serviced, the date and time of the service, the type of call, the results of tests and readings, any additional service or repair work done, suggestions for improved performance of the dishmachine or related equipment, and the account's inventory of Ecolab products." (Def. 56.1 ¶ 114; Pls. 56.1 ¶ 103.) RSMs are also expected to obtain a customer signature, (Def. 56.1 ¶ 115; Pls. 56.1 ¶ 99), however the parties dispute whether RSMs were expected to review the SDR with the on-site manager or decision-maker, of if anyone present at the account could sign the SDR. (Def. 56.1 ¶¶ 115, 119-20; Pls. 56.1 ¶¶ 98-99; Pls. Opp. Def. 56.1 ¶¶ 115, 119-20.) The SDRs are then submitted electronically to Ecolab by the RSM. (Pls. 56.1 ¶ 136.)

15

Ecolab also expects its RSMs to respond to ESRs within 60 minutes of receiving the request and monitors whether or not the RSM does so.[6]  (Pls. 56.1 ¶¶ 106-07.)  When RSMs do not respond to an ESR promptly, the call is escalated to the RSM's supervisor who then calls the RSM.  (Pls. 56.1 ¶ 152.)  Failure to respond promptly to an ESR may result in discipline.  (Pls. 56.1 ¶ 153.)  Ecolab also records the hours that RSMs work through the "ESM Program," an application on each RSM's tablet that requires users to enter a start and end time for each day worked, and a Performance Track reports the percentage of RPM calls and callbacks that each RSM made personally.  (Pls. 56.1 ¶¶ 139-40, 146, 210-13.)  Performance Track also tracks the RSM's individual call coverage, sales figures, and other data recorded from the RSM's SDRs.  (Pls. 56.1 ¶¶ 210-13, 215-20.)  Although plaintiffs do not dispute that Performance Track measures sales data on each of plaintiffs' accounts, the parties dispute whether plaintiffs were evaluated based on their sales performance and other sales metrics or whether they were evaluated based on plaintiffs' service call coverage and maintenance duties.  (Def. 56.1 ¶¶ 157-58, 160-68; Pls. Opp. Def. 56.1 ¶¶ 157-59, 160.)

---

[6] Defendant does not dispute that a 60 minute response time is required for Institutional Division RSMs; however, PureForce Division RSMs are only required to respond within 48 hours.  (Def. Opp. Pls. 56.1 ¶ 107.)

The parties also dispute whether plaintiffs' responsibilities with respect to maintenance and repair were their "primary duties," or whether in performing routine maintenance and responding to ESRs, plaintiffs also served as means for maintaining and developing customer relationships for the purpose of growing sales and taking advantage of possible sales opportunities.  Although defendant does not dispute that plaintiffs were responsible for repair and maintenance work, defendant asserts that plaintiffs were aware that they were expected to make sales and that their maintenance and response to requests for repairs were integral parts of furthering and promoting sales of Ecolab products.  (Def. Mem. at 16-17.)  It is undisputed that the RSM job description states that RSMs are expected to "maintain and grow sales within an existing route of foodservice and hospitality accounts" and provide "mechanical service combined with Ecolab's consultative sales approach to enhance [Ecolab's] total value to the customer."  (Melnyk Dec. ¶ 12, Ex. A; Sweeney Decl. Ex. 64.)  Plaintiffs respond with their own declaration that their primary duty was to perform service, maintenance, and repairs.  (Def. 56.1 ¶ 67 and plaintiffs' response thereto.)  Defendant presents evidence that "[u]nder Ecolab's sales model, the RSMs are supported by other positions including their managers, other field sales positions, and sales and marketing positions, who 'push' sales and provide

the RSM, as the customers' primary representative, with sales opportunities." (Def. 56.1 ¶ 83 (citing Declaration of Michael Ahearne in Support of Defendant's Motion for Summary Judgment ("Ahearne Decl.") ¶ 57); Declaration of Charles Melnyk in Support of Defendant's Motion for Summary Judgment ("Melnyk Decl.") ¶ 29; Declaration of John Myers ("Myers Decl.") ¶¶ 19-21.)

The SDR process and inventory review were critical functions in Ecolab's value-added sales model and allowed the RSM to regularly meet with the customer, evaluate the customer's needs, identify their competition, and provide customized sales consultation, for the purpose of building and retaining the customer relationship, identifying their needs, and selling the customer products to meet their needs. (Def. 56.1 ¶¶ 110-13, 121, 129.); Def. Opp. Pls. 56.1 ¶¶ 109-10.) In Ecolab's sales model the RSM, as the "on-site" sales representative, is expected to "pull through" and make the sales of Ecolab's products and should use the opportunity to sell or "upsell" to their customers through each service or maintenance visit. (Def. 56.1 ¶¶ 84, 92, 100-01.) Defendant asserts that Ecolab's value-added business model is consistent with its expectation that RSMs "maintain and grow sales within their existing accounts," (Def. 56.1 ¶ 67), and "grow" and "gain" customers. (Def. 56.1 ¶¶ 69-70.)

Plaintiffs do not dispute Ecolab's statement of expectations and its value-added business model, but assert that their primary job duty was to "maintain, install, and repair commercial dishwashing and other related equipment on the premises of Ecolab's customers." (Pls. 56.1 ¶¶ 74-77.) Plaintiffs argue that the "flow of the river" – or the notion that products "flowed" based on a customer's usage and needs - guaranteed product sales with or without the involvement of RSMs. (Pls. 56.1 ¶ 25 (citing Sweeney Decl. Ex. 18, Ecolab Training Document).) In fact, plaintiffs dispute that they had an opportunity to sell during customer visits, and assert that there was "no time or opportunity to sell because the primary job duty of Plaintiffs was to perform service, maintenance, and repairs to keep dishwashing and equipment working." (Pls. Opp. Def. 56.1 ¶ 92.) Rather, plaintiffs assert that the SDR and inventory review were simply for maintenance and repair purposes, and did not afford plaintiffs the opportunity to sell products. (Pls. Opp. Def. 56.1 ¶¶ 107-08.) Plaintiffs further contend that they did not have the opportunity to sell in corporate accounts that were negotiated and sold with a set number of products by Ecolab's sales team. (Pls. Opp. Def. 56.1 ¶ 83.)

Moreover, plaintiffs contend that, as RSMs, they were not expected to make sales calls or sell new accounts and leases

and that plaintiffs, in fact, did not sell new accounts. (Pls. 56.1 ¶¶ 159-62.) Defendant counters that as part of Ecolab's "Retain and Grow" goal, RSMs are encouraged to gain new business by calling on prospective customers and signing customers to new leases. (Def. 56.1 ¶¶ 159-60, 180.) Ecolab presented undisputed evidence that both Charlot and Tejada are listed as sales persons on dishwasher leases, and produced three leases listing Tejada as the Ecolab salesperson (Sweeney Decl. Ex. 75), and eight leases listing Charlot as the salesperson, (Sweeney Decl. Ex. 74). Plaintiffs contend, however, that the RSM job description does not include sales calls as part of the RSM's job duties. (Pls. 56.1 ¶ 178.) Plaintiffs cite to Tejada's deposition testimony that one of his leases corresponded to a period when he was a Territory Manager, and the other two were negotiated by Ecolab's salespersons, and not him. (Pls. Opp. Def. 56.1 ¶ 181 (citing Sweeney Decl. Ex. 17, Declaration of Jose Tejada in Support of Plaintiffs' Motion for Partial Summary Judgment ("Tejada Decl.") ¶ 28).) Moreover, Charlot testified his leases were also sold and negotiated by other salespersons, and not him. (Pls. Opp. Def. 56.1 ¶ 181 (citing Sweeney Decl. Ex. 15, Tejada Decl. ¶ 28).)

The parties also dispute whether Ecolab supervisors review the reports of the hours RSMs worked and whether RSMs are evaluated on their sales or the amount of service they

performed, the repairs they made, or the quality of the repairs. (Def. Opp. Pls. 56.1 ¶¶ 141-44.) Defendant presented evidence that RSMs' hours are not closely monitored, that RSMs have no specific start, end, and break times, and have little direct supervision, and RSMs are not expected to work certain hours or a number of hours in a given time period. (Def. 56.1 ¶¶ 141-144; Def. Opp. Pls. 56.1 ¶¶ 142-43.) Defendant also asserts that RSMs are able to plan their own schedules, take breaks as they choose, and have flexibility to adjust their workweek for personal and family obligations. (Def. 56.1 ¶¶ 141-44.)

Plaintiffs do not present contrary evidence, but instead contend that they and other RSMs were not able to work as they pleased because the amount of service and repair work was overwhelming. (Pls. Opp. Def. 56.1 ¶ 142 (citing Tejada Decl. ¶ 21, Declaration of Anthony Charlot in Support of Plaintiffs' Motion for Partial Summary Judgment ("Charlot Decl.") ¶ 15, Declaration of Alan Remache in Support of Plaintiffs' Motion for Partial Summary Judgment ("Remache Decl.") ¶ 21).) Plaintiffs also contend that they received warnings for not performing enough RPM calls in a monthly cycle. (Pls. 56.1 ¶ 116). On at least one occasion, a supervisor warned Charlot that failing to complete the required number of RPM calls was not acceptable. (Pls. 56.1 ¶ 109 (citing Sweeney Decl. Ex. 62 (Letter dated July 12, 2010 to Charlot)).) Tejada

received a similar warning with a threat of termination for his failure to complete and document the required number of service calls. (Pls. 56.1 ¶ 108 (citing Sweeney Decl. Ex. 61 (Email to Tejada re Performance Management)).)

Finally, defendant argues that RSMs' sales performances are tracked, and that the RSMs' "sales to budget, total sales revenue, and sales revenue growth are critical performance metrics." (Def. 56.1 ¶ 157-63.) Plaintiffs assert that "the most critical metric that Ecolab tracked was Plaintiffs' service call coverage," which was generated from the data each RSM recorded on a Service Detail Report. (Pls. Opp. Def. 56.1 ¶ 157.) Plaintiffs further contend that sales were not tracked to an individual employees, rather, Ecolab tracked only total sales in particular territory without crediting sales to any specific employee. (Pls. 56.1 ¶¶ 211-16; Pls. Opp. Def. 56.1 ¶¶ 157-62.) Moreover, plaintiffs argue that Ecolab does not track leases sold by RSMs, and only tracks which Ecolab associate originates a lease agreement with a new customer on the lease itself. (Pls. 56.1 ¶ 167.)

### 4.  RSM Job Description Requirements

Ecolab describes the Route Sales Representative position as a role on Ecolab's "sales team" and describes the position as a "sales opportunity." (Def. 56.1 ¶¶ 145-46; Melnyk Dec. ¶ 12, Ex. A; Sweeney Decl. Ex. 64.) The RSM Opportunity

description further states: "You will serve as the face of Ecolab for your customers, providing recommendations on advanced cleaning and sanitation processes and programs to create cleaner, safer, and healthier environments and drive a positive guest experience." (Def. 56.1 ¶ 66; Melnyk Dec. ¶ 12, Ex. A.) Under the heading "What You Will Do," the RSMs' duties are described as both "maintain[ing] and grow[ing] sales within an existing route of foodservice and hospitality accounts" and "combin[ing] . . . mechanical aptitude and technical/problem solving ability to install and repair dish machines," "learn[ing] customers' operations and devis[ing] unique solutions as their expert on advance cleaning and sanitation," "leverage[ing] your hands-on mechanical service combined with Ecolab's consultative approach to enhance our total value to the customer," and "provid[ing] emergency service coverage to appreciative customers." (Def. 56.1 ¶ 67; Melnyk Decl. ¶ 12, Ex. A.)

Ecolab's RSM job description requires basic qualifications such as an "ability to lift and/or carry 75 pounds," but does not require any sales qualifications other than a "minimum two years work or military experience." (Pls. 56.1 ¶ 120; Melnyk Decl. ¶ 12, Ex. A.) The job description also indicates as "preferred qualifications" both a "previous business to business value-add sales experience," "industry related experience in food service,

23

laundry, housekeeping, hospitality, and/or pool and spa," and "mechanical ability (e.g. plumbing and/or mechanical experience) and problem solving skills to troubleshoot and repair equipment and dispensing systems."  (Def. 56.1 ¶ 147; Pls. 56.1 ¶ 120; Melnyk Decl. ¶ 12, Ex. A.)  Under the heading "What's In It For You," the RSM position will "carve out a long term, advanced career path in sales, corporate accounts, or management," and allow employees to "grow [their] income as [they] drive sales in [their] market" "in a flexible, independent work environment." (Melnyk Decl. ¶ 12, Ex. A.)

> 5.   <u>Ecolab Job Training</u>

It is undisputed that plaintiffs received training prior to beginning their employment and throughout their employment, both in person and online, however, the parties dispute the focus of these trainings.  Plaintiffs assert that their training was primarily on the service, maintenance, and repair of commercial machinery.  (Pls. 56.1 ¶¶ 154-55; 158; *see* Sweeney Decl. Exs. 102 (Tejada Online Training Transcript), 103 (Remache online Training Transcript), 104 (Charlot Online Training Transcript).)

Defendant contends that RSMs received extensive training in sales techniques and Ecolab's chemicals and products in an initial three-week training course, and are expected to attend monthly sales meetings to learn about product offerings

24

and promotions, as well as sales technique training, including
how to evaluate customers' inventories and how to meet
customers' needs.  (Def. 56.1 ¶ 148-56.)  Defendant also asserts
that throughout their employment, RSMs are expected to take
self-paced online training focused on sales.  (Def. 56.1 ¶ 150.)
Plaintiffs counter that "[t]he training modules Plaintiffs
completed online were not related to making sales but rather
related to the maintenance and repair work they provided to
Ecolab's customers and included training on electrical safety,
water filtration, and warewashing installation and procedures."
(Pls. Opp. Def. 56.1 ¶ 150.)

### 6.   Plaintiffs' Compensation

As RSMs, plaintiffs received a base salary and
commissions from sales linked to their accounts or territories
during the time they worked at Ecolab.  (Def. 56.1 ¶¶ 204-06;
Pls. 56.1 ¶¶ 237, 242; see Sweeney Decl. Exs. 76-78 (plaintiffs'
commission statements).)  Plaintiffs also received incentive
rewards and bonuses based on their sales performance.  (Def.
56.1 ¶ 208.)  RSMs earn commissions on products their customers
purchase regardless of whether those products are delivered by
Ecolab or a distributor, including "mark-up" products.  (Def.
56.1 ¶¶ 60-61; Pls. 56.1 ¶¶ 204, 240.)  Commissions are also
paid for leases, and once an account is assigned to an RSM, for
all sales made in the account, regardless of which Ecolab

employee executed the order.  (Def. 56.1 ¶¶ 203-04; Pls. 56.1 ¶¶ 200-09, 239.)

Plaintiffs do not dispute their earnings from Ecolab as follows.  In 2009, Charlot earned $10,545.05 in total compensation under the Incentive Compensation Plan, of which $6,010.39 represented earnings from commissions.  (Def. 56.1 ¶¶ 223-24; Moechnig Decl. ¶ 5.)  In 2010, Charlot earned $65,287 in total compensation, of which $42,438 was commission pay. (Def. 56.1 ¶¶ 226-28; Moechnig Decl. ¶ 6.)  Between January and February 2011, Charlot earned $7,519.62 in total compensation, of which $4,175.37.00 represented commission payments.  (Def. 56.1 ¶¶ 230-32; Moechnig Decl. ¶ 7.)  Similarly, in 2010, Tejada earned $57,907 under the Incentive Compensation Plan, of which $32,053 was commission pay.  (Def. 56.1 ¶¶ 234-36; Moechnig Decl. ¶ 10.)  Tejada earned $59,617 in 2011, of which $34,845 was commission pay.  (Def. 56.1 ¶¶ 238-40; Moechnig Decl. ¶ 11.) Between January and March 2012, Tejada earned $15,001.75 in total compensation, of which $10,115.92 represented commission payments.  (Def. 56.1 ¶¶ 242-44; Moechnig Decl. ¶ 12.)  For the approximate one year that Remache was an RSM, his salary was higher than called for under the Incentive Compensation Plan. (Def. 56.1 ¶ 249.)  Even so, Remache earned $41,888 in 2012 under the Incentive Compensation Plan, of which $22,748.42 was commission pay.  (Def. 56.1 ¶¶ 246-48.)

7.  Ecolab's Service Center

Ecolab's Service Center is accessible through the Internet, email and a toll free 1-800 number, and the Service Center's contact information is communicated to the public through Ecolab's website, marketing materials, print advertisements, and its employees.  (Def. 56.1 ¶ 42-44; Pls. 56.1 ¶¶ 49, 133.)  The Service Center may also be physically accessed at its location in Eagan, Minnesota.  (Def. 56.1 ¶¶ 36-37, 45.)  The Service Center receives customer calls or inquiries and dispatches the call to the customer's RSM.  (Def. 56.1 ¶ 50.)  Customers may also place orders or request repairs and maintenance through the Ecolab Service Center number.  (Def. 56.1 ¶ 37-40, 42; Pls. 56.1 ¶¶ 46, 48-49, 261-62.)

Plaintiffs "performed administrative work at home, either before starting on or after returning from servicing the customers in their routes," however plaintiffs "Charlot and Tejada did not have a home office and rarely engaged in Ecolab work while at home."  (Pls. 56.1 ¶¶ 255-56.)  Remache used a section of his living room to store manuals and other administrative paperwork.  (Pls. 56.1 ¶ 257.)

Plaintiffs also owned Ecolab-issued PC Tablets, which contained information about each of their accounts and which they were expected to sync on a daily basis.  (Joint Appendix Ex. G, Deposition of Anthony Charlot ("Charlot Depo.") Tr. 44:9-

27

45:9, 143:13-15; Joint Appendix Ex. H, Deposition of Jose Tejada ("Tejada Depo.") Tr. 48:5-25; Joint Appendix Ex. I, Deposition of Alan Remache ("Remache Depo.") Tr. 253:18-254:14.) Plaintiffs accessed their PC Tablets each day to place orders, record their maintenance work through SDRs, receive information about new Ecolab products, and obtain other account information, such as budgets, outstanding invoices amount due, and indirect sales to the customer. (Pls. 56.1 ¶ 140; Def. Opp. Pls. 56.1 ¶ 46; Charlot Depo. Tr. 41:10-42:14, 50:3-6, 98:2-10; Tejada Depo. Tr. 15:24-16:10, 47:17-48:4; Remache Depo. Tr. 89:7-20; Joint Appendix Ex. C, Deposition of Douglas Moechnig ("Moechnig Depo.") Tr. 96:13-17.)

Although the parties do not dispute that Ecolab's Service Center is accessible to customers and operates as discussed, plaintiffs disagree that the Service Center is accessible to the general public, and contends that the Service Center is only available to commercial entities and Ecolab's customers. (Pls. Opp. Def. 56.1 ¶¶ 42, 45.)

## DISCUSSION

## I. LEGAL STANDARD

### A. Summary Judgment

"Summary judgment is appropriate where there is no genuine dispute as to any material fact and the record as a whole indicates that no rational factfinder could find in favor

of the non-moving party." *Graves v. Finch Pruyn & Co.,* 353 F. App'x 558, 560 (2d Cir. 2009) (citing *Rodal v. Anesthesia Grp. of Onondaga, P.C.,* 369 F.3d 113, 118 (2d Cir. 2004)). "In ruling on a summary judgment motion, the district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment and determine whether there is a genuine dispute as to a material fact, raising an issue for trial." *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 202 (2d Cir. 2007) (quotation marks omitted). "A fact is material when it might affect the outcome of the suit under governing law." *Id.* (internal quotation marks omitted). Moreover, an issue of fact is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

"In order to defeat a motion for summary judgment supported by proof of facts that would entitle the movant to judgment as a matter of law, the nonmoving party is required under Rule 56[ ] to set forth specific facts showing that there is a genuine issue of material fact to be tried." *Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir. 1993). "[O]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude entry of summary judgment." *Anderson,* 477 U.S. at 248. The nonmoving party may

not, however, "rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible, or upon the mere allegations or denials of the nonmoving party's pleading." *Ying Jing* Gan, 996 F.2d at 532–33.

When cross motions for summary judgment are made, the standard is the same as that for individual motions. *See Morales v. Quintel Entm't, Inc.,* 249 F.3d 115, 121 (2d Cir. 2001); *Eschmann v. White Plains Crane Serv., Inc.*, No. 11-CV-5881, 2014 WL 1224247, at *3 (E.D.N.Y. Mar. 24, 2014). The court must examine each party's motion independently, and "in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales*, 249 F.3d at 115.

## B.    Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.*

The FLSA imposes minimum wage and maximum hour requirements on employers. *See* 29 U.S.C. §§ 206–207. Congress enacted the FLSA in 1938 with the goal of "protect[ing] all covered workers from substandard wages and oppressive working hours." *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2162 (2012) (citing *Barrentine v. Arkansas–Best Freight System, Inc.,* 450 U.S. 728, 739 (1981)); *see also* 29 U.S.C. § 202(a). Among other requirements, the FLSA obligates employers to compensate employees for hours worked in excess of 40 per week at a rate of one and half times the employees'

regular wages.  *See* 29 U.S.C. § 207(a); *see Reiseck v. Universal Commc'ns of Miami, Inc.*, 591 F.3d 101, 104 (2d Cir. 2010).  The statute provides, in relevant part that,

> Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1).

The overtime compensation requirement, however, does not apply with respect to all employees, *see* § 213, and exempts workers "employed . . . in the capacity of outside salesman" or as a "commissioned salesperson."  29 U.S.C. §§ 213(a)(1), 207(i).  *Christopher*, 132 S. Ct. at 2162.  The exemptions to the overtime compensation requirement are defined by the Department of Labor ("DOL") regulations, and "[e]mployees whose jobs fall within one of the enumerated categories are not entitled to certain protections of the [FLSA] . . . .  Employers need not pay exempt employees overtime no matter how many hours they work each week."  *Schwind v. EW & Associates, Inc.*, 371 F. Supp. 2d 560, 562-63 (S.D.N.Y. 2005) (quoting *Wright v. AARGO Sec. Servs., Inc.,* No. 99-CV-9115, 2001 WL 91705, at *2 (S.D.N.Y.

Feb. 2, 2001)).  An employer seeking to rely upon an exemption as a defense to paying overtime bears the burden of proving that such exemption applies.  *Young v. Cooper Cameron Corp.,* 586 F.3d 201, 204 (2d Cir. 2009); *Reiseck,* 591 F.3d at 104; *Pippins v. KPMG LLP*, 921 F. Supp. 2d 26, 42 (S.D.N.Y. 2012) *aff'd*, 759 F.3d 235 (2d Cir. 2014).

The determination of exempt or nonexempt status hinges on two factors: the employee's salary and his/her actual duties at work.  *See* 29 C.F.R. § 541.2.  Whether an employee falls within an exemption under the FLSA "is a mixed question of law and fact."  *Myers v. Hertz Corp.,* 624 F.3d 537, 548 (2d Cir. 2010).  "The question of how the [employees] spent their working time . . . is a question of fact.  The question whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law."  *Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 558 (2d Cir. 2012) (quoting *Icicle Seafoods, Inc. v. Worthington,* 475 U.S. 709, 714 (1986)).

"A job title is not determinative of whether an employee is exempt under the FLSA."  *Pippins v. KPMG LLP*, 921 F. Supp. 2d 26, 42 (S.D.N.Y. 2012) *aff'd*, 759 F.3d 235 (2d Cir. 2014) (citing *Kadden v. VisuaLex,* No. 11-CV-4892, 910 F. Supp. 2d 523, 532–33, 2012 WL 4354781, at *5 (S.D.N.Y. Sep. 24, 2012)); 29 C.F.R. § 541.2.  Indeed, an employees' exempt status depends less on his title, and more on the actual duties

performed.  *Harper v. Gov't Employees Ins. Co.*, 754 F. Supp. 2d 461, 463 (E.D.N.Y. 2010).  Thus, a court must consider the employee's "actual work activities" and may not rely on the employer's characterization of those activities through a job title or job description.  *Pippins v. KPMG LLP*, 921 F. Supp. 2d 26, 42 (citing *Goldstein v. Dabanian,* 291 F.2d 208, 209 (3d Cir. 1961), *cert. denied,* 368 U.S. 928 (1961)) (internal citation omitted).  "Because the FLSA is a remedial statute, its exemptions are construed narrowly against the employer."  *Kahn v. Superior Chicken & Ribs, Inc.,* 331 F. Supp. 2d 115, 117 (E.D.N.Y. 2004) (citing *Arnold v. Ben Kanowsky, Inc.,* 361 U.S. 388, 392 (1960); *see Reiseck*, 591 F.3d at 104 (2d Cir. 2010).

## II.  ANALYSIS

Defendant contends that plaintiffs, who worked as Route Sales Managers and Sales and Service Route Managers (collectively, "RSMs") for Ecolab during the relevant time periods, were paid in compliance with the FLSA because they are "commissioned salespersons" pursuant to 29 U.S.C. § 207(i) or, alternatively, are exempt from the FLSA overtime provisions because they each qualify as an "outside salesman" pursuant to 29 U.S.C. § 213(a)(1).  Plaintiffs argue that neither provision of the FLSA applies, and that defendant failed to properly compensate plaintiffs for overtime work under the FLSA.  The court will address each affirmative defense in turn.

## A.    Commissioned Salespersons Pursuant to 29 U.S.C. § 207(i)

Title 29 U.S.C. § 207(i) ("Section 7(i)") addresses inequities that can arise in paying overtime to commissioned employees and provides parameters for FLSA compliance with such employees.  Section 7(i) provides that in the case of "employment by [a] retail or service establishment":

> No employer shall be deemed to have violated . . . [29 U.S.C. § 207](a) of this section by employing any employee of a retail or service establishment for a workweek in excess . . . [40 hours], if (1) the regular rate of pay of such employee is in excess of one and one-half times the minimum hourly rate . . . , and (2) more than half his compensation for a representative period (not less than one month) represents commissions on goods or services.  In determining the proportion of compensation representing commissions, all earnings resulting from the application of a bona fide commission rate shall be deemed commissions on goods or services without regard to whether the computed commissions exceed the draw or guarantee.

29 U.S.C. § 207(i).

In order to establish FLSA compliance for a commissioned salesman employee, an employer must demonstrate that the allegedly exempt employee: (1) earns at least one and one-half times the federal minimum wage; (2) earns more than half of his salary in commissions for a representative period not less than one month; and (3) is employed by a retail or service establishment.  *See* 29 U.S.C. § 207(i); 29 C.F.R.

34

§§ 779.410 *et seq.; Johnson v. Wave Comm GR LLC*, 4 F. Supp. 3d 423 (N.D.N.Y. 2014); *English v. Ecolab, Inc.*, No. 06-CV-5672, 2008 WL 878456, at *2 (S.D.N.Y. Mar. 31, 2008); *Schwind,* 371 F. Supp. 2d at 563.

> 1.   Regular Rate of Pay is in Excess of One and One-Half Times the Minimum Hourly Rate

The first requirement of Section 7(i) is that the commissioned salesman employee earns at least one and one-half times the federal minimum wage.  29 U.S.C. § 207(i).  The Supreme Court defines the regular rate of pay as "'the hourly rate actually paid the employee for the normal, nonovertime workweek for which he is employed' and 'by its very nature must reflect all payments which the parties have agreed shall be received regularly during the workweek, exclusive of overtime payments.'"  29 C.F.R. § 779.419 (quoting *Walling v. Youngerman-Reynolds Hardwood Co.,* 325 U.S. 419, 424 (1945)); *Schwind*, 371 F. Supp. 2d at 567.  The regular rate of pay "is a rate per hour, computed for the particular workweek by a mathematical computation in which hours worked are divided into straight-time earnings for such hours to obtain the statutory regular rate."  29 C.F.R. § 779.419.  The regulations further provide that "a single workweek" is the standard, and the averaging of hours over two or more weeks is not permitted.  *See* 29 C.F.R. § 778.104.

The current federal minimum wage is $7.25 per hour. U.S. Dept. of Labor, Wage and Hour Division, Minimum Wage, *available at* http://www.dol.gov/whd/minimumwage.htm. One and a half times that rate is $9.06 per hour. Only for the purposes of the summary judgment cross-motions, defendant has agreed to plaintiffs' contention that they worked up to 70 hours per week, and that weekly hours averaged between 50 to 70 hours per week. (Def. 56.1 ¶¶ 218-20.) Based on plaintiffs' salaries for the period they worked for Ecolab, it is undisputed that each of plaintiffs' hourly rates, assuming a 70-hour work week, exceeds 1.5 times the minimum wage. Charlot's effective hourly rate was not less than $14.75 per hour (Def. 56.1 ¶ 233); Tejada's effective hourly rate was not less than $13.56 per hour (Def. 56.1 ¶ 245); and Remache's effective hourly rate was not less than $13.80 per hour (Def. 56.1 ¶ 252). Plaintiffs do not dispute that defendant has met this requirement under Section 7(i). *See Clear Channel Outdoor, Inc. v. City of New York*, 594 F.3d 94, 111 (2d Cir. 2010) (affirming summary judgment where plaintiffs failed to meet their burden of coming forward with admissible evidence to rebut defendants' evidence and thus concluding that no material issue of fact existed). Accordingly, the undisputed evidence establishes that defendant has satisfied the first requirement that "the regular rate of pay of such employee is in excess of one and one-half times the

minimum hourly rate" under the Commissioned Salesperson exemption.

  2.  More than Half of Plaintiff's Compensation For a Representative Period is Based on Commissions For Goods or Services

The second requirement of Section 7(i) is that more than half of the commissioned salesman employee's compensation must be from commissions on goods or services.   29 U.S.C. 207(i).  In computing the amount of earnings attributable to commissions, "all earnings resulting from the application of a bona fide commission rate shall be deemed commissions on goods or services without regard to whether the computed commissions exceed the draw or guarantee."  *Id.; see also Spicer v. Pier Sixty LLC*, 269 F.R.D. 321, 333 (S.D.N.Y. 2010).  The parties do not dispute that more than half of plaintiffs' compensation was from commissions, however, the parties dispute whether defendant's commission plan is "bona fide."

Congress has not defined the meaning of "bona fide commission rate."  *Spicer*, 269 F.R.D. at 333 (S.D.N.Y. 2010). "The meaning of 'commission' under the FLSA 'is an issue that finds little illumination from the sparse case law and the vague references in statutes and regulations.'"  *Owopetu v. Nationwide CATV Auditing Servs., Inc. ("Owopetu I")*, No. 10-CV-18, 2011 WL 883703, at *3 (D. Vt. Mar. 11, 2011) (citing *Klinedinst v. Swift Invs., Inc.,* 260 F.3d 1251, 1254 (11th Cir. 2001)).  Thus, the

court must conduct an inquiry into "whether the employer set the commission rate in good faith," *Spicer*, 269 F.R.D. at 333 (quoting *Erichs v. Venator Grp., Inc.*, 128 F. Supp. 2d 1255, 1259 (N.D. Cal. 2001)), and whether an employee is receiving a commission that "actually functions as an integral part of a true commission basis of payment" or one that "is actually paid as a salary." 29 C.F.R. § 779.416. Guarantees that are paid as a salary do not qualify as bona fide commissions.

The DOL regulations have provided two non-exclusive examples for determining whether commission plans qualify as bona fide. First, a commission plan is not bona fide where "the employee, in fact, always or almost always earns the *same fixed amount* of compensation for *each workweek* (as would be the case where the computed commissions seldom or never equal or exceed the amount of the draw or guarantee)." 29 C.F.R. § 779.416(c) (emphasis added). Second, a commission plan is not bona fide where "the employee receives a regular payment constituting nearly his entire earnings which is expressed in terms of a percentage of the sales which the establishment . . . can always be expected to make with only a slight addition to his wages based upon a greatly reduced percentage applied to the sales above the expected quota." *Id.* These examples indicate that a commission plan is not bona fide if the employee will almost always receive a commission in the same fixed amount that seldom

or never exceeds the guaranteed base amount, and nothing or little more. *Id.* There is nothing in the DOL regulations that prohibits commissions being calculated and paid on team sales. *See id.*

Judge Posner instructed in *Yi v. Sterling Collision Ctrs., Inc.*, 480 F.3d 505, 508 (7th Cir. 2007), that "[t]he essence of a commission is that it bases compensation on sales, for example a percentage of the sales price, as when a real estate broker receives as his compensation a percentage of the price at which the property he brokers is sold." Judge Posner reasoned when a commissioned salesperson employee is paid a bona fide commission, the employee's income is "is likely to be influenced by the number of hours a week that he works, [and] the relation is unlikely to be a regular one." *Id.* Therefore, because an exempt commissioned employee's weekly income may be highly variable depending on the sales for each week, over the course of a year, the employee's hours of work may be similar to those of regular non-exempt hourly employees. But, had the exempt employee been paid overtime as well, "his annual income would be higher than [non-exempt employees] even though he hadn't worked more hours over the course of the year than they had." *Id.*

Courts in this Circuit have generally identified the following three components present in a commission-based payment

scheme: (1) the employee's compensation must be tied to customer demand or the quantity of sales; (2) the compensation plan must provide performance-based incentives for the employee to increase his or her income; and (3) there must be proportionality between the value of the goods or services sold and the rate paid to the employee. *Johnson*, 4 F. Supp. 3d at 442 (*citing Owopetu I*, 2011 WL 883703, at *1). These components ensure that commission-based compensation is "decoupled from the actual time worked," a characteristic that multiple circuit courts of appeals and the DOL have identified as a "hallmark" of how commissions work. *Owopetu I*, 2011 WL 883703, at *4 (citing *Parker v. Nutrisystem,* 620 F.3d 274, 284 (3d Cir. 2010)).

The court will address each of the three components articulated in *Johnson* and *Owopetu I*.

> a.    *Ecolab's Commissioned-Based Compensation Plan is Tied to Customer Demand and Quantity of Sales*

The first component of commissioned based compensation articulated in *Johnson* and *Owopetu I* is that the employees' compensation is tied to customer demand or the quantity of sales. *See Johnson*, 4 F. Supp. 3d at 442; *Owopetu I,* 2011 WL 883703, at *4. Defendant argues that plaintiffs "earned a percentage of the revenue generated by sales to the customers in their routes, and their commissions fluctuated . . . in direct proportion to the revenue generated by sales." (Def. Mem. at

24.)  Defendant further argues that plaintiffs' commissions "fluctuated from month to month and from year to year in direct proportion to the revenue generated by sales to their customers" and that plaintiffs' compensation was directly tied to the quantity of sales to their customers.  (*Id.*)

Indeed, Charles Melnyk testified that "Mr. Charlot and Mr. Tejada's commissions rose if . . . more chemicals and products [were sold] to their customers," and that "[plaintiffs'] commission earnings varied from month to month based on amount of products their customers purchased."  (Melnyk Decl. ¶ 39.)  The plaintiffs testified similarly, indicating they received commissions on sales made in accounts in their territories, whether those sales were made by orders plaintiffs placed themselves, orders placed through the customer center or other Ecolab representatives, or orders placed through distributors.  (Charlot Depo. Tr. 121:3-13; 124:20-125:13]; Tejada Depo. Tr. 249:19-250:12; Remache Depo Tr. 180:18-181:2.)  Moreover, plaintiffs testified that some months or seasons were busier than others, both in terms of sales revenue that was generated as well as how many hours were worked.  (Tejada Depo. Tr. 224:8-225:1.)

With respect to the first factor, it is undisputed that sales based on customer demands resulted in commissions being paid to plaintiffs, and it is inconsequential who on the

41

plaintiffs' sales team "closed" or executed the sale.  In accordance with 29 U.S.C. § 207(i), employees of a retail or service establishment need not be "salesmen" in order for their commissions to qualify as bona fide, so long as the employees' commissioned compensation was tied to "customer demand and the quantity of [the employer's] sales." *Owopetu I*, 2011 WL 883703, at *5 (noting that plaintiff was not a salesman, but because his compensation was tied to "customer demand and quantity of sales," he was paid a bona fide commission).  As the *Owopetu I* court noted, "[a]lthough the "sales commission" may be the most common type of commission, 'persons not engaged in the sale of goods — receivers, trustees, bailees, and others — are sometimes compensated in the form of what are commonly called commissions . . . within the meaning of 29 U.S.C. § 207(i)[.]'" *Owopetu I*, 2011 WL 883703, at *4 (citing *Mechmet v. Four Seasons Hotels, Ltd.*, 825 F.2d 1173, 1175 (7th Cir. 1987)).

Here, it is undisputed that the commissions plaintiffs received were tied to customer demand and the quantity of Ecolab's team sales, some of which plaintiffs themselves executed with their customers during their routine maintenance visits.  Although plaintiffs contend that they had no control over the accounts assigned to them and the commissions they earned, they do not dispute that they earned commissions whenever customers made purchases, regardless of whether

plaintiff or another Ecolab representative executed the sale. (Pls. 56.1 ¶¶ 200-09; 237-40; Def. 56.1 ¶¶ 203-06, 209-10.) Because plaintiffs' commissions were connected to customer demand or quantity of sales, the first component of a bona fide commission-based compensation is present in Ecolab's commission payments. (*See* Def. 56.1 ¶¶ 82-84, 99.)

> b. *Ecolab's Compensation Plan Provides Performance-Based Incentives for The Employee to Increase Commissions*

The second component articulated in *Johnson* and *Owopetu I* is that the employer's payment of commission-based compensation incentivized its employees to improve performance in order to increase income from sales commissions. Plaintiffs assert that they were not paid a bona fide commission because the number of hours plaintiffs worked had no correlation to their commissions. Plaintiffs' assertion misses the point that bona fide commission-based compensation is "decoupled from the time actually worked," which, according to the DOL and multiple circuits is a "hallmark" of how commissions work. *Owopetu I*, 2011 WL 883703, at *4; *Parker*, 620 F.3d at 284. Plaintiffs further assert that their commissions were merely tied to the products purchased by customers in the territory assigned to plaintiffs, irrespective of any sales or efforts made by plaintiffs themselves. (Pls. Mem. at 36.) Plaintiffs cite no

authority that prohibits payment of commissions based on team sales as opposed to sales by an individual.

Plaintiffs also argue they rarely sold new products in their accounts and each account had a pre-established inventory of products that the customer had already agreed to purchase; thus, purchases were automatic and based on replenishing the pre-set inventory on the account. (*Id.*) Thus, plaintiffs contend that they had "almost no control over the products Ecolab customers purchased and almost no opportunity to increase the amount of sales." (Pls. Mem. at 36.)

Plaintiffs further argue that they have no control over the accounts assigned to them and the corresponding commissions generated by those accounts. (Pls. Mem. at 36.) Indeed, plaintiffs assert that they lost or gained accounts, and thereby the commissions attached to them, based on account realignments that were beyond their control. (Pls. Mem. at 37.) Plaintiffs further contend that they received commissions on accounts in their territories, even when they had never visited the customer. (Sweeney Decl. Exs. 2, 216(B) Declaration of Alan Remache ¶ 25; 3, 216(B) Declaration of Jose Tejada ¶ 22.)

Defendant responds that Ecolab's Incentive Compensation Plan "gave plaintiffs an 'incentive to hustle and work efficiently in order to obtain more opportunity for increased compensation.'" (Def. Mem. at 25.) Defendant argues

that plaintiffs could impact their commission income by working efficiently to ensure that customers' dishwashers and dispensers were properly dispensing chemicals, offering thorough review of customers' inventories and product needs, and identifying and fulfilling customers' product needs.  (Def. Mem. at 25.) Indeed, defendant contends that Ecolab's value-added sales model relied on plaintiffs' ability to build relationships during routine maintenance and service calls with their customers in order to identify customers' needs and consult with customers to meet those needs, and retain customers and grow sales.

The undisputed evidence establishes that Ecolab's compensation plan provided performance-based incentives because (1) plaintiffs had an impact on sales, directly through product sales and recommendations, and indirectly by building and retaining customer relationships customers through good customer service; and (2) plaintiffs were incentivized to more efficiently and effectively service their accounts and build positive customer rapport in order to increase sales revenue and therefore their commissions.  First, plaintiffs were able to sell or "push" products during customer visits.  Although Ecolab's corporate accounts often utilized product programs with specifically priced products that various branch locations could choose, but were not obligated, to buy, these "product programs" did not guarantee the sales beyond the minimum purchase

requirement.  (Melnyk Reply Decl. ¶¶ 24–26; Melnyk Reply Decl.
Ex. 6 (National Purchasing Corporation Agreement, at § 1.1
("[I]f after that 60-day period that Member still chooses not to
participate in the HPSI-Ecolab program, then, HPSI may work with
an alternate supplier.").)  Indeed, Melnyk provided in his sworn
declaration that "[c]orporate contracts do not guarantee the
sale of Ecolab products" nor can they make their franchisees
purchase Ecolab products.  (Melnyk Reply Decl. ¶¶ 24–25.)
Ecolab's product programs provide "baseline[s] that can be
modified to suit the needs of each individual location."  (*Id.*
¶ 23.)  Moreover, Melnyk testified that "[e]ven if a contract
does purport to limit what an RSM can offer to its customers,
the RSM can still recommend the product to a customer, get a
commitment to buy . . . and work with corporate accounts to
secure those approvals."  (*Id.* ¶ 27.)

        Moreover, the evidence establishes that Ecolab's
value-added sales model relies on an RSM's ability to meet with
and maintain customer relationships, in addition to the
responsibilities of maintaining and repairing dishwashing
machines.  Even if each routine visit by an RSM to the customer
does not necessarily result in a product order, Ecolab's value-
added model expects the visit to foster the relationship between
Ecolab's customer and the RSM, thereby increasing satisfaction
and increasing the likelihood that the customer will continue to

employ Ecolab's services and purchase its products.  Plaintiffs acknowledged that customer relationships and rapport played an important role in Ecolab's sales efforts.  Charlot testified that "[s]ales could be – I could install a motor, a rebuilt motor; it's a form of sales.  I could do service on a dishwasher; that's a form of sales." (Charlot Depo. Tr. 98:21-24.)  Charlot further explained that "when you say sales, it's not only the product.  You gotta count the service part also." (*Id.* at 99:7-9.)  Charlot testified that "part of making the Ecolab sale is by giving [customers] good customer relationships." (*Id.* at 114:4-8.)  He explained that "[i]f you can't fix the machine, they're not going to use you.  That's why I try to take care of the equipment.  That's one of the reason [sic] I always have a good relationship with my customers." (*Id.* at 113:3-7.)  Providing good service to the customers and building a relationship "made [customers] loyal to Ecolab." (*Id.* at 113:8-25; *see also* Charlot Depo. Tr. 138:13-169:11.) Similarly, Tejada testified that he was encouraged to have "good customer rapport" and that it was a way to retain and "attempt to grow" revenue from that customer.  (Tejada Depo. Tr. 137:19-139:4.)  Remache also testified that his role as an SSRM impacted the amount of revenue generated through "the service that [SSRMs] did for these customers, that retained the customers." (Remache Depo. Tr. 183:12-19.)  He explained that,

47

"[b]y offering good service to the customers and doing good repairs and not having to return for the same issue, the customers were satisfied with PureForce and would continue to purchase PureForce chemicals." (Remache Depo. Tr. 183:21-25; *see also* Remache Depo. Tr. 185:2-20.)

Plaintiffs also acknowledged they were encouraged and expected to "grow" accounts. Charlot explained that he was expected to focus on "growing" the account, which meant that "if one of [his] account [*sic*] uses three products . . . instead of selling three product [*sic*], try to get another product in there." (Charlot Depo. Tr. 101:16-19.) He described this as "push[ing] more product" and "try[ing] to sell additional products in the account, into the existing account." (*Id.* at 102:3-5; 109:17-21.) Tejada likewise testified that Ecolab expected RSMs to try and expand the number of products in a customer's program. (Tejada Depo. Tr. 57:9-22.) Remache also testified that he made recommendations to his customers when he could, for example, if he noticed that the customer was using a competitor brand, he would recommend a similar Ecolab-branded product. (Remache Depo. Tr. 138:20-139:4.) Charlot indicated that RSMs increased their commissions by ensuring that customer's machines were working properly, the chemicals were flowing properly, and customers continued to use Ecolab's products. (*Id.* at 125:14-19; 126:6-10.) Furthermore,

48

plaintiffs' monthly sales performance was tracked and measured by the Performance Track, which reported each plaintiffs' sales in terms of sales growth and as a percentage of the plaintiffs' sales goals and budget. (Sweeney Decl. Ex. 73, Tejada's Performance Track Report; Ex. 78, Charlot's Performance Track Report; *see* Melnyk Depo. Tr. 112:18-114:12.)

Finally, defendant concedes that it "realigns a minimal amount of accounts each year . . . to optimize the accounts," but established that those realignments were minimal. (Def. Opp. to Pls. 56.1 ¶ 245.)  Melnyk testified that the realignments of customer accounts accounted for only 100 out of 100,000 of the accounts in the New York area. (Melnyk Depo. Tr. 278:9-17.)  Moreover, defendant argues that Ecolab's method of compensating plaintiffs incentivized plaintiffs to work faster and more efficiently in consulting with and servicing customer accounts, because as RSMs became more experienced, their base salaries were lowered and they were assigned more accounts to increase their opportunity to earn higher commissions. (Tr. 71:7-72:23.)

Although plaintiffs state without evidentiary support that their monthly visits to their customers had no impact on sales, the record evidence and witness testimony establishes otherwise.  First, despite contending that Ecolab controlled plaintiffs' commissions and that their commissions were not

49

legitimately earned by plaintiffs under a bona fide commission system, plaintiffs testified that they were entitled to and earned their commissions. (Sweeney Decl. Ex. 1, Charlot Decl. ¶¶ 22-23; Charlot Depo. Tr. 51:14-25; Sweeney Decl. Ex. 2, Remache Decl. ¶¶ 25-26; Sweeney Decl. Ex. 3, Tejada Decl. ¶¶ 22—23.)

Moreover, although plaintiffs assert that they did not have time to pitch products or promote sales during routine customer visits, (*see* Pls. 56.1 ¶ 185), and that each visit may not have resulted in an immediate sale or product order, nevertheless, plaintiffs do not dispute that each visit fostered and maintained the relationship between Ecolab and its customers, which lead to greater customer retention and satisfaction, and ultimately more sales. Plaintiffs also argue that they earned commissions for accounts they never visited in support of their contention that their visits had no impact on their commissions, however, there is no dispute that Ecolab *expected* plaintiffs to regularly visit all their customers in an effort to foster customer relationships and retain customers. (Def. 56.1 ¶¶ 93-94, 122; Pls. 56.1 ¶¶ 89, 91-94, 105-06.) Counsel for defendant conceded that from time to time, with 120

accounts, plaintiffs may not visit a particular customer in a particular cycle.[7]  (Oral Arg. Tr. 51:16-52:14.)

Plaintiffs also argue that they were paid commissions on sales made before the accounts were aligned to their routes. (Oral Arg. Tr. 17:4-15.)  Nevertheless, the fact that, at times, plaintiffs received commissions from accounts they did not visit or that were reassigned to them does not compel a different conclusion with respect to the court's finding that plaintiffs' regular visits to customer sites affected customer sales, both directly and indirectly, and that commissions incentivized plaintiffs' performance.  Indeed, Remache acknowledged it was not always possible to visit 100% of his customer base in a given period, and testified that the district manager "made it clear to [him] and the other route managers that if you're going to get to any accounts, get to your top ones" because those accounts "buy the most chemicals."  (Remache Depo. Tr. 211:23-212:15.)  Thus, even accepting as established for purposes of the instant motion that plaintiffs could and did receive commissions on accounts for which they did not provide service or consummate a sale, this accounted for a minor portion of their commissions, and their commission-based salary otherwise

---

[7] Counsel for defendant at oral argument represented that when an RSM repeatedly fails to meet his customer accounts without explanation, and still gets a commission, the account gets reassigned to a new RSM, and the former RSM is potentially fired.  (Oral Arg. Tr. 51:13-52:14; 62:17-63:16.)  The court does not consider counsel's argument in considering the factual record presented by the parties' motions.

continued to incentivize their efforts to increase commissions when possible.

Furthermore, defendant correctly notes that "courts have found that employees have been paid commissions that are tied to quantity of sales based on services performed in situations where service workers do not sell," (Def. Reply at 33), and cites *Owopetu v. Nationwide CATV Auditing Servs., Inc.* ("*Owopetu I*"), 2011 WL 883703 (D. Vt. Mar. 11, 2011), and *Yi v. Sterling Collision Centers, Inc.*, 480 F. 3d 505, 509-10 (7th Cir. 2007). In *Owopetu I*, the court found that the plaintiff's commissions as a technician, and not a salesperson, who received a percentage of the contract price paid by the customer for each work order performed, qualified as a bona fide commission within the meaning of Section 207(i), even though Owopetu himself never executed any sales. *Owopetu I*, 2011 WL 883703, at *4-5. The court reasoned that the defendant-employer's method of compensation qualified as a bona fide commission within the purview of the FLSA's overtime provision because: (1) the commissions provided incentive to the employees to work faster and more efficiently because technicians could increase their pay by completing more work orders; (2) the commissions were proportional amounts paid by the consumer; and (3) compensation was tied to customer demand and the quantity of sales, even

though plaintiff himself was not involved in sales. *Owopetu I*, 2011 WL 883703, at *4.

Similarly in *Yi*, the court found that compensation of auto repair technicians with no responsibility for or control over sales was nonetheless "based on sales" because plaintiffs' compensation depended on "the flow of wounded cars into each of [the employer's] local repair shops" and the amount of time spent working on each repair. *Yi,* 480 F. 3d at 509-10. The *Yi* court reasoned that plaintiffs' commissions depended on the number of cars requiring repair each week, which in turn depended on the unpredictable decision-making of the consumers. The court also reasoned that the employees' commission structure did not conflict with the overall purposes of FLSA overtime requirements, which are intended to encourage employers to "spread work in order to reduce unemployment, to discourage (by increasing the cost to the employer) a degree of overtime that might impair workers' health or safety, and to increase the welfare of low-paid workers." *Yi*, 480 F.3d at 510 (quoting *Mechmet v. Four Seasons Hotels, Ltd.,* 825 F.2d 1173, 1175-76 (7th Cir. 1987)). The court in *Yi* noted that the faster and more efficiently plaintiffs worked, the more commission they earned. (*Id.*)

Extending the rationale here, the undisputed evidence establishes that plaintiffs were provided incentive to work more

efficiently and effectively to build customer relations and increase sales, whether those sales were ultimately executed by plaintiffs or other Ecolab representatives.  Although plaintiffs contend that they were unable to directly influence sales by pitching more expensive or additional products, plaintiffs were able, at the minimum, to enhance the customer experience and develop and maintain customer relationships in order to encourage customers to continue purchasing Ecolab's products. Accordingly, defendant has satisfied the second component of a commission-based compensation scheme.

> c.   *The Value of Goods Sold Is Proportional to*
> *Plaintiffs' Commissions*

Finally, the third component of a commission-based compensation scheme requires that the value of goods or services sold to consumers be proportional to plaintiffs' commissions. Defendant argues that there was proportionality between the value of the goods and services plaintiffs sold and the commission they received.  Specifically, defendant submits that plaintiffs Charlot and Tejada earned between 3 and 10 percent of the sales price their customers paid for cleaning and sanitizing chemicals and between 5 and 25 percent of the sales price their customers paid for non-chemical products.  (Moechnig Decl. ¶ 4; Myers Decl. ¶ 26.)  Plaintiffs dispute that they had any

discretion to focus their efforts on items that had higher commission percentages.  (Pls. Opp. Def. 56.1 ¶ 207.)

Here, construing the evidence in the light most favorable to plaintiffs' contention they had no discretion over the products they sold or impact on customer sales, it is undisputed that plaintiffs' commissions were based on a percentage of the goods sold, and that the value of the goods varied.  Proportionality is met where the "[employees] are paid a percentage of the scheduled rate for every service they perform, and their pay thus fluctuates 'in tandem' with the value of each service." *Johnson*, 4 F. Supp. 3d at 443 (citing *Owopetu I*, 2011 WL 883703, at *5).  Because "'[c]ommissions, for purposes of Sec[tion] 7(i), usually denotes a percentage of the amount of monies paid out or received' as opposed to paying a set flat-rate for every item, regardless of its value," the undisputed evidence establishes that the proportionality component here is met.  *Owopetu I*, 2011 WL 883703, at *5 (citing Dep't of Labor Op. Ltr., 2005 WL 3308624 (Nov. 14, 2005)).  Here, plaintiffs admit that their commissions were based on a percentage of the total value of goods sold and that commission rates varied between product types.  (Charlot Depo. Tr. 121:3-13.)

Thus, construing all inferences in favor of plaintiffs, and considering each of the components typically

55

present in a bona fide commission-based compensation scheme, the totality of the record, and the policy rationale for the commission-based compensation provisions of the FLSA, the court finds, based on the undisputed evidence, that more than half of plaintiffs' compensation was based on bona fide commissions for goods and services within the meaning of the FLSA.

3.   Retail or Service Establishment

The third requirement of Section 7(i) is that the commission-based employees are employed by a "retail or service establishment."  29 U.S.C. § 207(i).  Section 7(i) does not define the term "retail or service establishment."  Instead, the court looks for guidance to the definition contained in the now-repealed section 13(a)(2) of the FLSA, to determine if an employer is a "retail or service establishment."[8]  *See Johnson v. Wave Comm GR LLC*, 4 F. Supp. 3d 423, 434 (N.D.N.Y. 2014) (noting that "[c]ourts have continued to apply the definition contained

---

[8] The DOL Regulations regarding retail or service establishments have not been updated since 1970 and were not subject to rulemaking with notice and comment procedures because the DOL deemed them to be interpretive rather than carry the force of law.  *English*, 2008 WL 878456, at *6-8.  Other district courts in this circuit have noted that, "because the DOL regulations were promulgated without the benefit of notice-and-comment rulemaking and were not issued pursuant to an express grant of rulemaking authority, . . . they therefore should be considered interpretive regulations that receive *Skidmore* deference" and not *Chevron* deference.  *Kelly*, 2010 WL 1541585, at *21 n.16 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)) (noting that the DOJ regulations should only be considered "persuasive to the extent that their reasoning and analysis is compelling"); *see English,* 2008 WL 878456, at *5-7); *compare Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 171-74 (2007) (holding that the DOL regulations interpreting section 13(a)(5) of the FLSA, which were issued through notice-and-comment rule-making pursuant to an express delegation of rule-making authority, were entitled to *Chevron* deference).  This court thus examines the regulations for persuasive interpretive only.

in the repealed '§ 13(a)(2)' of the FLSA in determining whether an employer is a retail or service establishment."); *Kelly v. A1 Tech.*, No. 09-CV-962, 2010 WL 1541585, at *10–11 (S.D.N.Y. Apr. 12, 2010) ("[C]ourts have uniformly concluded that, despite the 1989 repeal of . . . section 13(a)(2) . . ., the definition of a retail or service establishment that was contained in that section still applies to the phrase as used in section 7(i)"); 29 C.F.R. § 779.411 (explaining that, for purposes of section 7(i), the definition of "retail or service establishment" is found in repealed section 13(a)(2) of the FLSA).  Under the repealed Section 13(a)(2) of the FLSA, a retail or service establishment is defined as "an establishment 75 per centum of whose annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry." *Johnson*, 4 F. Supp. 3d at 434; *English,* 2008 WL 878456, at *2 (quoting 29 U.S.C. § 213(a)(2) (repealed by Pub. L. No. 101-157 (1989)).

The regulations further define a retail or service establishment as:

> one which sells goods or services to the
> general public.  It serves the everyday needs
> of the community in which it is located. The
> retail or service establishment performs a
> function in the business organization of the
> Nation which is at the very end of the stream
> of distribution, disposing in small
> quantities of the products and skills of such
> organization and does not take part in the

manufacturing process.

29 C.F.R. § 779.318(a).  "The legislative history of the section 13(a)(2) exemption for certain retail or service establishments shows that Congress also intended that the retail exemption extend in some measure beyond consumer goods and services to embrace certain products almost never purchased for family or noncommercial use." *English*, 2008 WL 878456, at *8 (citing 29 C.F.R. § 779.318(b)).  Indeed, "[d]espite this reference to supplying goods and services to the general public, the regulations recognize that, consistent with the clear statement of congressional intent in the legislative history of the 1949 amendments, the provision of goods and services to commercial customers does not necessarily prevent an establishment from qualifying as a retail or service establishment." *Kelly*, 2010 WL 1541585, at *12.  Thus, the court rejects plaintiffs' argument that Ecolab's customers preclude it from qualifying as a retail or service establishment.

There is no bright line rule for determining whether an establishment is a "retail or service establishment;" therefore, a case-by-case approach that considers all circumstances relevant to the business at issue is necessary in making this determination.  *See Schwind*, 371 F. Supp. 2d at 564-65.

a.    *Establishment at a Fixed, Physical Place*

The Supreme Court considered the meaning of "establishment" under the now repealed Section 13(a)(2) exemption, and found that for the purposes of both the § 7(i) and § 13(a)(2) exemptions, "Congress used the word 'establishment' as it is normally used in business and in government . . . as meaning a distinct physical place of business." *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 496 (1945); *see also* 29 C.F.R. § 779.23 ("As used in the [FLSA], the term establishment, which is not specially defined therein, refers to a 'distinct physical place of business' . . ."); *see Chen v. Major League Baseball Properties, Inc.*, No. 14-CV-1315, 2015 WL 4772359, at *4 (2d Cir. Aug. 14, 2015) (citing *A.H. Phillips*, 324 U.S. at 496) (discussing term "establishment" under repealed Section 13(a)(2) in the context of "seasonal and recreational or amusement" establishment exception to the FLSA); Dep't of Labor, Opinion Letter, FLSA, 2003 WL 23374597, at *3 (Mar. 17, 2003) ("The term establishment . . . refers to a distinct physical place of business.").

The regulations further provide, in part, that "an establishment, wherever located, will not be considered a retail or service establishment within the meaning of the Act, if it is not ordinarily available to the general consuming public." 29 C.F.R. § 779.319. Thus, in addition to a dedicated, physical

space, an "establishment" must make its products and services accessible to the public for sale. *English*, 2008 WL 878456, at *9 (citing *Morales v. Sr. Officers' Open Mess,* No. 344-72, 1974 WL 1337, at *2 (D.P.R. Nov. 11, 1974) (finding that a private club is not open to the public, and therefore not a retail establishment under the Act)). "Public accessibility," however, does not require *in personam* access. *English*, 2008 WL 878456, at *9. The DOL explains, however, that "[a]n establishment . . . does not have to be actually frequented by the general public in the sense that the public must actually visit it and make purchases of goods or services on the premises in order to be considered as available and open to the general public." 29 C.F.R. § 779.319. For instance, a "refrigerator repair service shop . . . is available and open to the general public even if it receives all its orders on the telephone and performs all of its repair services on the premises of its customers." *Id.* Telephone contact has been found to be sufficient to satisfy the public accessibility requirement. *See English*, 2008 WL 878456, at *9 (citing *Wirtz v. Keystone Readers Serv., Inc.*, 418 F.2d 249, 257 (5th Cir. 1969) ("We must have either a physical or electronic confrontation or communication between buyer and seller before we can say there is access by the customer to the selling establishment.")).

Plaintiffs argue that "call centers" do not qualify as retail establishments because they do not serve the "every day needs of the community," and do not "serve the general public by providing a retail product or service in the traditional sense." (Pls. Mem. at 29 (distinguishing *Parker v. ABC Debt Relief, Ltd. Co*., No. 10-CV-1332, 2013 WL 371573, at *9-10 (N.D. Tex. Jan. 28, 2013)).) Plaintiffs further allege that defendant's reliance on the *English* decision is misplaced. Specifically, plaintiffs assert that the *English* court ignored the requirement in 29 C.F.R. § 779.318 that a retail or service establishment is one which "*sells* goods or services to the general public," and that Section 207(i) is inapplicable to business locations in which no retail sales take place. Plaintiffs argue that the *English* court erroneously concluded that Section 207(i) was satisfied because plaintiffs, as local service specialists in Ecolab's Pest Elimination Division, were available for telecommunications with the public. (Pls. Mem. at 34.) In *English*, the court found Ecolab had a fixed, permanent establishment because its Pest Division service specialists maintained a "fixed, physical work space in their homes and are readily and easily accessible by the Ecolab customer base." *English,* 2008 WL 878456, at *10.

Moreover, plaintiffs distinguish Ecolab's Service Center from decisions which found call centers to be retail

establishments, because in those cases, the exempt employees worked at the call centers, performing their sales work from that fixed location. (Pls. Mem. at 34 (citing *Selz v. Investools, Inc.*, No. 09-CV-1042, 2011 WL 285801, at *1 (D. Utah Jan. 27, 2011) and *Parker v. ABC Debt Relief, Ltd. Co.*, 2013 WL 371573, No. 10-CV-1332, 2013 WL 371573, at *1 (N.D. Tex. Jan. 28, 2013)).) The court finds plaintiffs' arguments unpersuasive.

It is not disputed that Ecolab sells hundreds of cleaning, sanitizing, and food safety products to full-service and fast food restaurants, hotels, and public facilities and protects the places where the public eats, works, plays and heal, by helping its customers maintain a clean, safe, and healthy environment. (Def. 56.1 and Pls. Opp. Def. 56.1 ¶¶ 5-7.) Thus, Ecolab meets the everyday needs of the general public.

Moreover, it is undisputed that Ecolab's Service Center is "readily accessible to the general public over the Internet, by email and a toll-free 1-800 number" and "may be physically visited by customers and members of the public" at the Service Center's physical location in Eagan, Minnesota. (Def. Mem. at 10; Supplemental Declaration of Charles Melnyk ("Melnyk Supp. Decl.") ¶¶ 16-18.) Furthermore, the Ecolab Service Center's contact information is communicated to the

public through Ecolab's website, marketing materials, and print advertisements.  (Def. 56.1 ¶ 42-45.)  The Service Center is the central hub of Ecolab sales of products and services and receives customer calls or inquiries for products and services and dispatches the calls to Ecolab's RSMs.  (Def. 56.1 ¶ 50.) Customers may also place orders or request repairs and maintenance through the Ecolab Service Center number.  (Pls. 56.1 ¶ 261-62.)  Moreover, plaintiffs were expected to enter and record product orders during routine maintenance and service or repair visits, and were expected to sync their Ecolab PC tablets on a daily basis, in order to send and receive product and service order information, additional product orders they placed for customers, and receive and report on their maintenance and service visits with customers.  (Def. Opp. Pls. 56.1 ¶ 46; Charlot Depo. Tr. 40:8-41:14, 44:9-11; 91:11-25, 92:6-22; Tejada Depo. Tr. 47:17-48:25, 73:7-23; Remache Depo. Tr. 253:23-254:14, 256:10-19.)  Plaintiffs also communicated customer orders to the Service Center by phone.  (Melnyk Decl. ¶ 10; Myers Decl. ¶ 4.)

Under the parameters provided by the DOL Regulations, the fact that the public may obtain Ecolab's products, goods, and services through email or telephone contact with Ecolab's Service Center does not place Ecolab outside the scope of a "retail or service establishment."  The court agrees with defendant's view that a "retail or service establishment" may be

accessible to the public by telephone, Internet or other means and that "[t]he connection between a fixed establishment and the customer is far easier to achieve given today's cellular forms of technology and other forms of communication." *English*, 2008 WL 878456, at *10. Thus, even if Ecolab lacked a physical space where the public may purchase its products or services, that circumstance would not be dispositive. *See Kelly*, 2010 WL 1541585, at *13 (noting that "a business must be 'ordinarily available to the general public' to qualify as a retail or service establishment, although the physical location of the business in an industrial plant or office building is immaterial, as is the actual frequency of visits by the general public") (citing 29 C.F.R. § 779.319). Here, the Ecolab Service Center is a physical space that makes its products and services accessible for sale to the general public. The court accordingly finds, based on the undisputed evidence, that the Ecolab call center is a fixed, permanent establishment that is available, and sells goods and services, to the general public. Therefore, plaintiffs are employees of a retail or service establishment with a fixed, physical place that is accessible to the public within the meaning of the FLSA.[9]

---

[9] Alternatively, another court in this Circuit has found that an "Ecolab local service specialist" had a fixed, permanent establishment in their home office (or other personal workspace). *English*, 2008 WL 878456, at *10. The *English* court found that, although customers did not visit these service specialists in their homes, the service specialists were "readily available for direct,

b.    *Goods and Services Not Sold for Resale*

Commissioned Salesperson compensation under Section 207(i) requires that the commissioned salesperson employee be employed by an "establishment 75 per centum of whose annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry."  29 C.F.R. § 779.411.

The FLSA does not define the term "resale," but DOL regulations and other courts apply the "common meaning" of resale which "is the act of 'selling again.'"  29 C.F.R. § 779.331; *see also Schwind,* 371 F. Supp. 2d at

---

two-way communication with the public through a wide range of communication devices."  *Id.* (citing *Stevens v. Welcome Wagon Int'l, Inc.,* 261 F. Supp. 227, 231 (E.D. Pa. 1966)) (holding that home office of local saleswoman affiliated with nationwide advertising/promotional firm was qualifying establishment for § 7(i) exemption; plaintiff maintained a telephone listing (presumably her home number) in the name of the defendant employer)).  Thus, the court found that the essential characteristics of an "establishment" had been met.  Here, although "Charlot and Tejada did not have a home office and rarely engaged in Ecolab work while at home," and Remache used a section of his living room to store manuals and other administrative paperwork, the plaintiffs "performed administrative work at home, either before starting on or after returning from servicing the customers in their routes."  (Pls. 56.1 ¶ 255-57.)  More significantly, plaintiffs could be reached by, and could contact their customers and Ecolab through Ecolab's Service Center at all times, and had Ecolab-issued PC tablets, on which plaintiffs could receive and place customer orders, complete service reports, retrieve sales information, and review customer account information, including customer inventory levels, prior customer requests, and budget and sales information. (Charlot Depo. Tr. 41:10-42:14; 50:3-6, 98:2-10; Tejada Depo. Tr. 15:24-16:10; 47:17-48:4; Remache Depo. Tr. 89:7-20.)  Plaintiffs were able to access this information at any time, either from their homes or on the road, and were expected to sync these tablets with Ecolab at least on a daily basis.  (Charlot Depo. Tr. 44:9-45:9; 143:13-15; Tejada Depo. Tr. 48:5-25; Remache Depo. Tr. 253:18-254:14.)  Thus, extending the *English* court's sound reasoning, the court concludes that, in the alternative, defendant has established that plaintiffs are employees of an establishment with a fixed, physical place within the meaning of the FLSA because plaintiffs were "readily available for direct, two-way communication with the public through a wide range of communication devices."  *English,* 2008 WL 878456, at *10.

566; *English,* 2008 WL 878456, at *11 n.15.  In determining whether goods or services are sold for resale, "sale" means "any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition."  29 C.F.R. § 779.331.  "A sale is made for resale where the seller knows or has reasonable cause to believe that the goods or services will be resold, whether in their original form, or in an altered form, or as a part, component or ingredient of another article."  *Id.; see Schwind,* 371 F. Supp. 2d at 564 n.3.

The regulations indicate that the retail character of goods sold to industrial or commercial customers depends on the customers' use of such goods.  *English*, 2008 WL 878456, at *11.  For example, the regulations provide that coal sold for the production of electricity is a raw material used in the production of a specific product to be sold and is therefore considered "for resale."  29 C.F.R. § 779.333.  In contrast, coal sold to businesses such as bakeries for purposes of fuel and/or heat is not "for resale."  *Id.*  In another example, ice used to keep perishable items cold is not for resale, while ice cubes sold for use in drinks are for resale.  *Id.*  The distinction turns on whether the good is sold to the end consumer in either in its original or altered form or consumed by the commercial or business entity for general uses.  *English*,

2008 WL 878456, at *11 (noting that pesticides used in hospitality and restaurant businesses are not for resale).

Plaintiffs make two arguments that more than 75% of Ecolab's products are sold for resale: (1) plaintiffs claim that Ecolab sells over 50% of its chemical products to distributors for resale; and (2) plaintiffs argue that Ecolab's clients "use Ecolab's dishwashing services to provide clean implements for their customers' use, thereby reselling the services to the customer." (Pls. Mem. at 27.) The court will address each argument in turn.

### i.    Resale Through Distributors

Plaintiffs first argue that defendant cannot satisfy the requirements of Section 207(i) as a matter of law because defendant has conceded that over 50% of its chemical products are "sold to distributors for resale to their customers using Ecolab machines." (Pls. Mem. at 27.) Plaintiffs argue that Ecolab sells its products to distributors, and the distributors take "title and possession" of the product to resell it for a profit. (Pls. Mem. at 11; Plaintiffs' Reply in Support of Their Motion for Partial Summary Judgment ("Pls. Reply") at 19-20.) Plaintiffs contend that distributors also profit through refunds and other payments, but that these are not traditional "delivery fees" based on cost of delivery. (Pls. Opp. Def. 56.1 ¶ 57.) Moreover, plaintiffs note that Ecolab requests its distributors

to complete a resale tax exemption certificate to claim a tax exemption on sales to distributors.  (Pls. Opp. Def. 56.1 ¶ 56; Sweeney Decl. Ex. 89, Ecolab Distributor Program Policy (the "Policy").)

In support of their argument, plaintiffs do not submit invoices or other documents establishing sales by Ecolab to distributor.  Plaintiffs instead point to Ecolab's Institutional Sector "Distributor Program Policy," attached to the Sweeney Declaration as Exhibit 89.  The Ecolab Distributor Program Policy outlines the pricing, ordering, shipping, and reporting procedures, as well as "payment terms" and credit procedures which state that payment must be made 30 days from invoice. (*See* Sweeney Decl. Ex. 89 at 5.)  Under the Policy, Ecolab provides "buy pricing and corporate contract end-user pricing" to the distributor and advises distributors that price lists from any other source will not be honored.  (*Id.* at 3.)  The Ecolab distributor policy requires distributors to report monthly "all sales/product movement to any and all end-user customers (along with all returns and any other product transfers)," and disbursement reports of all products shipped to end users.  (*Id.* at 5.)  Ecolab's Policy advises distributors that it uses the information in part to "ensure that cost and service commitments made to mutual end users are fulfilled by the Ecolab field sales and service teams."  (*Id.* at 5-6.)  The

foregoing requirements establish that Ecolab maintains pricing controls over the distributors and requires tracking of its products to end users.

Plaintiffs argue that the Policy indicates that when Ecolab products are transferred to distributors, they are "sold" within the regular meaning of a business transaction, and that Ecolab does not retain ownership over the product or control of what the distributor does with Ecolab's product. (Pls. Mem. at 27; Pls. Reply at 19.) Plaintiffs also rely to no avail on the conclusory testimony by Douglas Moechnig that: "[His] understanding is, when Ecolab sells a product to a distributor, that is a sale of the product and that the ownership of the inventory transfers to the distributor." (Pls. Opp. Def. 56.1 ¶¶ 52-58 (citing Moechnig Depo. Tr. 136:6-9).)

Defendant notes that plaintiffs mischaracterize the deposition testimony of Melnyk and Moechnig, who testified that more than 50% of Ecolab's sales are *delivered*, not sold, through distributors. (Def. Reply at 23 (emphasis in original); Melnyk Depo. Tr. 219:16-219:17, 249:23-250:6.) Douglas Moechnig testified in response to a question regarding the accuracy of the statement "distributors represent 50 percent of Ecolab's sales," that "sales that are delivered through a distributor represent roughly 50 percent of Ecolab's sales." (Moechnig Depo. Tr. 32:11-17; *see also* Melnyk Depo. Tr. 248:24-249:1 ("The

69

way I read it is, the distributor would ship 50 percent of
Ecolab's sales, method of delivery.").)  Moechnig also submitted
in a sworn affidavit that "[f]or the time period between 2010
and 2013, close to 90 percent of the combined sales and revenue
of the Institutional and PureForce divisions were sales where
Ecolab established the purchase price."  (Supplemental
Declaration of Douglas Moechnig ("Moechnig Supp. Decl.") ¶ 5.)

        Defendant's contention that distributors do not
"resell" Ecolab's products, but rather, serve only as a method
of delivery to Ecolab's customers for which Ecolab pays a
"drayage" or "delivery fee" is supported by undisputed evidence.
(Def. Reply at 23; *see* Def. Mem. at 10 n.9, 22-23.)  It is
undisputed that even when Ecolab products are delivered through
distributors, Ecolab retains the direct relationship with the
customer through regular customer contact, and by setting the
price of Ecolab products sold to the customer.  (Def. 56.1
¶ 56.)  Moechnig testified that it was at the discretion of the
customer whether the Ecolab products were delivered directly by
Ecolab or through a distributor, and that, where customers had
limited storage space, delivery through a distributor allowed
for receipt of smaller shipments on a more frequent basis than
delivery directly from Ecolab, which would require a larger
shipment.  (Moechnig Depo. Tr. 38:6-23.)

John Myers also stated in his sworn declaration that "distributors are sometimes involved in the process of getting Ecolab's products to Ecolab's customers" but they are "merely a shipping channel that meets the convenience and efficiency needs of both Ecolab and its customers." (Supplemental Declaration of John Myers ("Myers Supp. Decl.") ¶ 9.) He noted that "[d]istributors . . . do not 'sell' Ecolab products," rather "[SSRMs] communicate [customers'] order[s] to the distributor's representative . . . to maintain control over the order and assure customers receive the products they need in a timely manner." (*Id.* ¶ 10.) Furthermore, in his sworn declaration, Myers attested that Ecolab would terminate the relationship with customers that resold Ecolab products. (Myers Supp. Decl. ¶ 7.)

Finally, although defendant acknowledges that some distributors were allowed to "mark-up" sales prices to Ecolab's customers instead of paying a delivery fee. Defendant submits unrefuted testimony that resales through distributors occurred less than 11% of the time during the relevant time period. (Def. 56.1 ¶¶ 57–58; Moechnig Decl. ¶¶ 15–16.) Moechnig explained that "[i]n almost all circumstances there's no markup" when a distributor sells Ecolab product to a customer. Rather, "when Ecolab sells product to a distributor, that distributor then ships the product to the customer as a method of delivery. There's no markup on that product. The distributor makes their

money by – we pay them a 10 percent handling fee to distribute that product . . . we use the distributor simply as way to get the product from point A to point B in a cost-efficient manner." (Moechnig Depo. Tr. 124:10-125:1; *see also* Myers Depo. Tr. 71:18-725 ("[Ecolab] sell[s] the product to the food distributor, the food distributor then distributes the [product] to the end user, and in doing so they make a handling fee and profit based on the distribution piece of it.").)

Plaintiffs fail to furnish evidence to rebut defendant's evidence that only 11% of Ecolab's sales constitute a "resale" through distributors, and that any other sale through distributor is for the purpose of delivery and not a resale. Plaintiffs primarily rely on the Distributor Program Policy and legal argument to contend that distributors purchase products from Ecolab, take title and possession, and then resell the products to the end user. (*See* Sweeney Decl. Ex. 89; Pls. Mem. at 19-21; *see* Oral Arg. Tr. 32-40.) Plaintiffs specifically point to the Policy's language that "Ecolab is required to maintain current resale exemption certificates on file" and that distributors are "requested to fax [tax] exemption certificates to the Ecolab Credit Department." (Sweeney Decl. Ex. 89 at 5; *see also* Oral Arg. Tr. 39:2-40:19.) Plaintiffs also point to language indicating that distributors are charged a 15%

restocking fee for any product returns.  (Sweeney Decl. Ex. 89 at 4; *see also* Oral Arg. Tr. 2-14.)

    First, the Distributor Program Policy governs all distributor transactions, which include the sales of products for a "markup" as well as those in which distributors serve only as a delivery channel.  Defendant has presented undisputed evidence that 11% of its sales comprised re-sales through distributors with a mark-up to the customer.  (Moechnig Decl. ¶¶ 15-16.)  The Policy does not specify what percentage of Ecolab's sales through distributors constitute sales for delivery purposes or sales for a mark-up to customers, nor does it indicate that *all* sales through distributors represent sales with markups, or alternatively, resales.  Moreover, the Policy requires that distributors provide a product disbursement report on a monthly basis for all products shipped to the end-use customers in order to "accurately calculate refunds and handling fees to Distributor" and to "ensure that cost and service commitments made to mutual end users are fulfilled by the Ecolab field sales and service teams." (*Id.* at 6.)  This language sufficiently establishes that Ecolab maintains the relationship with the end-user, such that distributors only service the needs of the end-users at the discretion of and under the terms authorized by Ecolab.  Indeed, if Ecolab were selling products to distributors in the traditional sense – where the buyer takes

ownership, title, and possession for its own usage and purposes – the distributor would not be restricted in pricing Ecolab's products nor required to report the movement of products to end-users.  Moreover, although the Policy indicates that tax exemption certificates are requested because "Ecolab is required to maintain current resale exemption certificates on file," (Sweeney Decl. Ex. 89), there is no evidence that these certificates are required for all Ecolab transactions with distributors, or whether tax certificates are only required of those 11% from distributors who resell Ecolab products with a markup.

Thus, though relevant, the Policy does not rebut defendant's evidence, including sworn testimony, that only 11% of Ecolab's sales through distributors allowed for a mark-up to the end user, and that the remainder of sales through distributors represented transactions for the purpose and convenience of delivery, in which Ecolab retained the relationship with the customer, and not resales.

Moreover, customer agreements provided by plaintiffs further support defendant's contention that Ecolab retained the relationship with the end-user and that distributors served only as delivery channels.  For example, in Ecolab's "Product and Services Supply Agreement," Ecolab requires its customer, or end-user, to purchase Ecolab products from Ecolab directly or

through an Ecolab-authorized distributor, and that Ecolab will
"instruct its distributors who will be delivering Products to
Customer locations to make only Ecolab products available to
Customer properties." (Sweeney Decl. Ex. 13, Branded
Restaurants Product and Services Supply Agreement; Ex. 14, Briad
Restaurant Group LLC Product and Services Supply Agreement.)  In
addition, the Agreements provide product prices which remain
fixed for the initial 12 months, and then become subject to
increases by Ecolab.  This language shows that Ecolab retains
the relationship with the end-user, despite the distributor
serving as a delivery channel.  Again, if distributors were
taking ownership, title, and possession of Ecolab's goods, the
distributors would not be subject to Ecolab's terms of sale to
the end-user.

Moreover, other courts have found that transactions
involving intermediaries between the employer and end user did
not constitute "resales" under the FLSA.  In *Schwind v. EW &*
*Associates, Inc.*, the defendant-employer supplied independent
contractors who provided computer training to their clients, and
billed those clients for those services.  *Schwind*, 371 F. Supp.
2d at 565.  The end users who received the computer training
paid the defendant's clients, and the clients then paid the
defendant-employer.  *Id.* at 566.  The court found that "it [was]
clear that the services provided by [defendants] were not

75

intended for resale [because] [d]efendants supplied trainers to clients who would train the client's employees or the client's business customers, whichever was required by the client." *Id.* The court reasoned that the defendant-employer's services were at the end of the stream of distribution and thus not intended for resale. The *Schwind* court noted that the regulations define resale as "selling again," 29 C.F.R. § 779.331, and that defendants "did not sell a service that was then resold; rather, defendants provided a service to the end customer, even if it was their client's customer." *Schwind*, 371 F. Supp. 2d at 566.

Similarly, in *Johnson v. Wave Comm GR LLC*, the court found that the defendant-employer's provision of installation services to Time Warner's customers did not constitute goods for resale because there was no reselling. *Johnson*, 4 F. Supp. 3d at 435. The *Johnson* court reasoned that "the customers to whom [the defendant-employer] directly provide[s] its services are 'at the very end of the stream of distribution,' and therefore [the defendant-employer] 'provide[] . . . repair services . . . for the comfort and convenience of [the general] public in the course of its daily living,' as opposed to providing them for redistribution." *Johnson*, 4 F. Supp. 3d at 435-36 (citing *Owopetu I,* 2011 WL 883703, at *7). The *Johnson* court further noted that it was "inconsequential that [the defendant-employer] is compensated by Time Warner for its services rather than by

the end customer" because "it [was] merely a matter of convenience that payment passe[d] through Time Warner as charges for installation services included in the customers' monthly cable bills." *Id.*

Likewise, in *Owopetu I*, 2011 WL 883703, at *7, the court found that the defendant-employer's provision of cable and internet installation and repair services to end users through Time Warner Cable did not constitute "sales for resale" because there was no subsequent "sale" after the services were provided. The court reasoned that "the customers to whom [defendant-employer] directly provides its services are 'at the very end of the stream of distribution,' and therefore [defendant-employer] 'provides . . . its repair services . . . for the comfort and convenience of [the general] public in the course of its daily living,' as opposed to providing them for redistribution." *Owopetu I*, 2011 WL 883703, at *7 (citing 29 C.F.R. § 779.318(a)).

The same result is warranted here. Ecolab's provision of products to distributors does not constitute a resale transaction because the customers to whom Ecolab provides its goods and services – e.g. restaurants and other hospitality institutions - are at the very end of the stream of distribution and therefore "provides . . . its products and repair services . . . for the comfort and convenience of [the general] public in

the course of its daily living," as opposed to providing them for redistribution. 29 C.F.R. § 779.318(a). As in *Schwind*, *Johnson*, and *Owopetu I*, it is inconsequential that Ecolab may be compensated by its distributors, because the cost is ultimately paid by Ecolab's customer and it is simply a "matter of convenience" that the distributor sell and deliver the goods to Ecolab's customers. *See Johnson,* 4 F. Supp. 3d at 435-36; *Owopetu I*, 2011 WL 883703, at *8; *Schwind,* 371 F. Supp. 2d at 566. Accordingly, the minimal resale with markups by 11% of Ecolab's sales through distributors does not foreclose the determination that Ecolab meets the Section 7(i) criteria.

ii. <u>Resale Through Customers</u>

Plaintiffs also argue that Ecolab's dishwashing and cleaning products are "resold" by their restaurant, hotel, and institutional customers to end-users, for example, patrons of the restaurant or hospitality establishment. Plaintiffs rely on 29 C.F.R. § 779.334, which provides that:

> Sales of services to a business for a specific use in performing a different service which such business renders to its own customers are in economic effect sales for resale as a part of the service that the purchaser in turn sells to his customers. For example, if a storage establishment uses mothproofing services in order to render satisfactory storage services for its customers, the sale of such mothproofing services to that storage establishment will be considered a sale for resale.

29 C.F.R. § 779.334; *see Johnson*, 4 F. Supp. 3d at 436.
Analogizing this example to the facts here, plaintiffs contend
that Ecolab's clients "use Ecolab's dishwashing services to
provide clean implements for their customers' use, thereby
reselling the services to the customer." (Pls. Mem. at 27.)

Defendant counters that plaintiffs' argument
mischaracterizes Ecolab's business model as services for
"resale," and that a "common sense approach" establishes that
the products defendant sells are not resold, and that in fact,
if a customer were found to be reselling Ecolab's products,
Ecolab would terminate the relationship. (Defendant's
Memorandum of Law in Opposition to Plaintiffs' Motion for
Partial Summary Judgment and In Reply ("Def. Reply") at 22; Def.
56.1 ¶ 15-17.) Moreover, defendant argues that "Ecolab places
its products and services at the end of the distribution stream,
demonstrating that the services were not intended for resale,"
because "[o]nce Ecolab sells the product to the customer that
then washes dishes or cleans tables with Ecolab's product, the
job is complete." (Def. Reply at 24.)

The court is also unpersuaded by plaintiffs' citation
to the DOL's *amicus brief*, which was submitted to the Seventh
Circuit in *Alvarado, et al. v. Corporate Cleaning Service, Inc.*,
719 F. Supp. 2d 935, 945 (N.D. Ill. 2010). (Sweeney Decl. Ex.
106.) Although the DOL argued that "a distinct third party

79

arrangement involving a real intermediary and an actual sale for resale . . . precludes application of section 7(i)'s exemption," the Seventh Circuit in *Alvarado* disagreed.  (*Id.* at 28-29.)  In its April 1, 2015 decision, the Seventh Circuit affirmed the lower court's determination that the defendant-employer's window cleaning services were not resold by building owners and managers, despite the fact that the building owners and managers passed on the costs of window cleaning to the occupants of the building.  *Alvarado v. Corporate Cleaning Servs., Inc.,* 782 F.3d 365, 369 (7th Cir. 2015).  The Seventh Circuit reasoned by analogy that "[i]t would be absurd to suggest that a dealer in motor vehicles, when it sells a truck to a moving company, is 'wholesaling' the truck because the buyer will doubtless try to recover the cost of the purchase in the price he charges for his moving services, which utilize the truck."  *Id.* at 369.

Plaintiffs' reliance on *Goldberg v. Furman Beauty Supply Inc.,* 300 F.2d 16, 18-19 (3d Cir. 1962), is similarly misplaced.  In *Goldberg,* defendant-employer was a beauty supply dealer that sold beauty products to beauty shops and beauticians.  *Id.*  As the Seventh Circuit pointed out in *Alvarado*, *Goldberg* involves a different statutory exemption than the compensation of commissioned employees under Section 207(i).  *See Alvarado*, 782 F.3d at 369.  Second, the facts are distinguishable because the products at issue in *Goldberg* –

beauty supply products, such as hair lotions and rinses – were sold to defendant-employer's customers, i.e., the beauty shops and beauticians, who then physically applied and transmitted as part of their service these beauty products to their own clientele, the patrons of the beauty salons.  300 F.2d at 17-18. In finding that the beauty shops and beauticians "resold" the products to their clientele, the court reasoned that "[t]he beneficent effects, whatever they may be, of the supplies are received ultimately by women who visit the beauty shop, not by the hairdresser." *Id.* at 18.

Ecolab, however, does not sell products and services which are passed onto or used by restaurant patrons.  Instead, Ecolab's restaurant and hospitality establishment customers are the end users of Ecolab's products and services.  Although restaurants and other establishments use Ecolab's chemical products and equipment in order to comply with health regulations and provide clean environment, utensils, and other service-ware to their own customers, it is the Ecolab customers that use the products.  Thus, Ecolab's customers are the user of Ecolab's products at the end of the stream of commerce.  This situation, is more akin to the use of ice to keep perishable and other goods cold, or coal used to heat an establishment, than the use of ice in drinks served to customers or use of coal to create coal byproducts.  *See* 29 C.F.R. § 779.333; *Alvarado v.*

*Corporate Cleaning Servs., Inc.,* 782 F.3d 365, 369 (7th Cir. 2015) (rejecting argument that building managers who buy defendant's window cleaning services "resell" to the building's occupants by passing costs onto occupants); *English*, 2008 WL 878456, at *12 (finding pest-elimination services were not "resold" to patrons of restaurants that purchased services); *Schwind,* 371 F. Supp. 2d at 565-66 (rejecting argument that service was intended for resale where defendant company provided computer training services to businesses that in turn provided training services to their own clients). Although Ecolab's customers may be passing along product or service costs to the end-consumer – the patron of the restaurant – "the patron is ultimately paying for the cost of utilities, cooking equipment, hand soap in the restroom, and the ice used to keep a perishables fresh." *Id.* This, does not mandate the conclusion that Ecolab's cleaning and sanitizing supplies are "for resale."

Applying the reasoning set forth in *Alvarado, English,* and *Schwind*, the court finds that the sale, lease, or services by plaintiffs of defendant's cleaning products and equipment are not "for resale" by Ecolab's customers. *See English*, 2008 WL 878456, at *12. Accordingly, the evidence establishes that not more than 25% of Ecolab's sales of goods and services are resold, either through distributors, or through their customers.

c.  *Goods or Services Recognized as Retail in Industry*

The requirement that an establishment's sales or services be recognized as retail in the particular industry has been interpreted by the DOL to establish a two-part test.  *Kelly v. A1 Tech.*, No. 09-CV-962, 2010 WL 1541585, at *11 (S.D.N.Y. Apr. 12, 2010).  First, the establishment must be part of an industry in which there is a "retail concept", and, second, the establishment's sales or services must be recognized as retail in that particular industry.  *Id.* (citing 29 C.F.R. §§ 779.316, 322.)  In addition to operating in an industry that has a concept of retail sales or services, "a business must be 'ordinarily available to the general public' to qualify as a retail or service establishment, although the physical location of the business in an industrial plant or office building is immaterial, as is the actual frequency of visits by the general public."  *Kelly*, 2010 WL 1541585, at *13 (citing 29 C.F.R. § 779.319); *English,* 2008 WL 878456, at * 9–10.

i.  <u>Retail Concept</u>

To determine whether a particular business has a retail concept, courts look to whether the business: (1) "sells goods or services to the general public"; (2) "serves the everyday needs of the community" by providing for the "comfort and convenience of such public in the course of its daily

83

living"; and (3) is at the end of the stream of commerce." *Johnson*, 4 F. Supp. 3d at 440 (citing 29 C.F.R. § 779.318(a)).[10]

Plaintiffs argue that Ecolab's products do not serve the everyday needs of the community because Ecolab's customers are businesses and its products are meant for commercial use to meet the needs of businesses such as restaurants, hotels, and other hospitality providers. (Pls. Mem. at 28-29.) Plaintiffs further contend that Ecolab's sales to multi-unit corporate customers in quantities larger than residential usage qualifies as "wholesale" and cannot be considered retail. (Pls. Mem. at 30.) Moreover, plaintiffs argue that Ecolab offers discounts and special pricing for its corporate customers. (*Id.*)

Defendant argues that "[t]he fact that most of Ecolab's customers are businesses is irrelevant to whether its sales are retail." (Def. Mem. at 26.) Moreover, defendant argues that the fact that Ecolab sells its services in quantities larger than would be demanded by an individual household does not preclude Ecolab from being a retail

---

[10] The DOL regulations provide a non-exhaustive list of establishments to which the retail concept does not apply, including air-conditioning and heating systems contractors; establishments engaged in furnishing, installing and repairing burglar alarms for commercial establishments; establishments engaged in the business of dealing in chemical equipment; finance companies, engineering firms; and school supply distributors. 29 C.F.R. § 779.317. The regulations also include a non-exhaustive list of establishments whose sales or services may be recognized as retail, indicating that they are part of industries with a "retail concept." This list includes barber shops; clothing stores; drug stores; household refrigerator service and repair shops; watch, clock and jewelry repair establishments; restaurants; and theaters. 29 C.F.R. § 779.320.

establishment.   (Def. Reply at 27 (citing *Alvarado*, 719 F. Supp. 2d at 945).)   Relying on the court's decision in *English,* defendant contends that "[j]ust like the pest elimination products and services sold and marketed in *English*, the public demands clean dishes and sanitary kitchens, regardless of whether they are eating at home or at a restaurant." *English*, 2008 WL 878456, at *13.

Thus, although Ecolab's products are sold to end users, but are not sold directly to end-consumers, such as patrons in a restaurant, the products ultimately serve the every day needs of those end-consumers. *See Alvarado*, 782 F.3d at 369 (noting that window washing service that sold cleaning to services to building owners and managers, who undoubtedly passed cost onto occupants of building, qualified as "retail or service establishment" under Section 207(i)); *Schwind,* 371 F. Supp. 2d at 565 (finding that defendant company "served the every day needs of the community," despite selling its services to commercial businesses, who in turn provided the service to its own customers, because the services – computer training – met "an essential need" in today's world).

Indeed, the Supreme Court has recognized that "Congress intended that the retail exemption extend in some measure beyond consumer goods and services to embrace certain products almost never purchased for family or noncommercial

use." *Idaho Sheet Metal,* 383 U.S at 203; *see* 29 C.F.R. § 779.318(b).  The products that would fall under this category include those that have widespread use similar to consumer goods, are often distributed in showrooms similar to those used for consumer goods, and are frequently used in commercial activities of limited scope.  29 C.F.R. § 779.318(b).  The regulations caution, however, that "[t]he list of strictly commercial items whose sale can be deemed retail is very small and a determination as to the application of the retail exemption in specific cases would depend upon the consideration of all the circumstances relevant to the situation."  *Id.*

Here, the fact that Ecolab's services and products were sold to business customers and not to households does not place Ecolab outside the scope of Section § 7(i).  The undisputed material evidence discussed above establishes that Ecolab has a retail concept and serves the everyday needs of the community.

### ii.    Recognition as Retail

If an establishment is determined to be a business that has a "retail concept" and is available to the public, the next question is whether three-quarters of its sales or services are recognized as retail "in the particular industry."  *Kelly*, 2010 WL 1541585, at *13.  "Such a determination must take into consideration the well-settled habits of business, traditional

understanding and common knowledge."  29 C.F.R. § 779.324.  In making this decision, courts should consider the understandings of persons with knowledge of recognized industry classifications as well as sellers, purchasers, employers, employees, and private or governmental research organizations.  *Id.; Johnson*, 4 F. Supp. 3d at 440; *Owopetu v. Nationwide CATV Auditing Servs., Inc.* ("*Owopetu II*"), No. 10-CV-18, 2011 WL 4433159, at *4 (D. Vt. Sept. 21, 2011) (explaining that court must first look to evidence as to how people in the industry view the establishment).

Defendant relies on the testimony of three Ecolab Executives/Managers with personal knowledge and "several years of collective experience selling cleaning products to the hospitality industry (both for Ecolab and other companies)." (Def. Mem. at 21.)  These witnesses attest that: "(1) Ecolab is considered a retailer because Ecolab sells to the general public with an interest in purchasing cleaning solutions; (2) Ecolab holds itself out to customers (as well as its RSMs) as a retail entity; and (3) there is no set plan for the resale of Ecolab's products at the time those products are being sold." (*Id.*; Myers Supp. Decl. ¶ 6; Moechnig Supp. Decl. ¶ 8; Melnyk Supp. Decl. ¶¶ 10-15.)  Defendant also relies on the testimony of Donald Winter, a consultant with over 45 years of professional experience in the hospitality, restaurant and food services

industries, who testified that based on his professional experience and knowledge of Ecolab, he considers Ecolab a retailer in the hospitality and food service industries.  (Def. Mem. at 21; Joint Appendix Ex. E, Deposition of Donald Winter ("Winter Depo.") Tr. 38:9-19, 45:22-24, 50:8-52:14.)

       Plaintiffs argue that the evidence and testimony submitted by defendant in support of its claim that Ecolab is recognized as retail is inadmissible.  Specifically, plaintiffs contend that "Winter's testimony is inadmissible because he previously offered it as expert testimony, (Order, dated Sept. 11, 2014), and "[i]t cannot now be converted into a lay opinion or fact witness testimony." (Pls. Mem. at 31.)  Plaintiffs further argue that defendant is unable to rely on the other witnesses, whose identities defendant has not disclosed pursuant to Federal Rules of Civil Procedure 26 and 37(c).  Moreover, plaintiffs argue that it is the industry's perspective, not Ecolab's, that is probative of whether or not it is recognized as retail." (Pls. Mem. at 32 (citing 29 C.F.R. § 779.324) ("It is "clear from the legislative history and judicial pronouncements that it was not the intent of this provision to delegate to employers in any particular industry the power to exempt themselves from the requirements of the Act.").)  Finally, plaintiffs argue that "even if the declarations were admissible evidence, they do nothing more than 'summarily

conclude' that Ecolab is recognized as retail." (Pls. Reply at 27.)

Defendant responds that whether or not Winter provides his testimony as an expert or lay witness for the purpose of determining whether Ecolab is considered retail in the industry has no bearing on its admissibility. (Def. Reply at 31.) Instead, defendant contends that it is sufficient in a "recognized as retail analysis" that Winter "properly lays a foundation to testify as to his experiences, and the substance of his testimony pertains to his perception of the hospitality, restaurant and food services industries." (Def. Reply. at 30.)

Proposed experts may testify as lay witnesses where they also have personal knowledge of the subject matter. *State Farm Fire & Cas. Co. v. Nutone, Inc.,* No. 05-CV-4817, 2008 WL 4541024, at *3 (E.D.N.Y. Sept. 30, 2008) (accepting affidavit of proposed expert witness as to facts and personal observations); *Faryniarz v. Nike, Inc. (Faryniarz II),* No. 00-CV-2623, 2002 WL 1968351, at *3 (S.D.N.Y. Aug. 23, 2002) (allowing witness who had been precluded as an expert to testify as lay witness to non-scientific and factual knowledge). Thus, the court finds no reason to reject the testimony of Donald Winter, to the extent it is based on his personal knowledge. Mr. Winter has "been involved with the hospitality industry for more than 45 years, continuously" and is "intimately familiar with food, beverage

89

. . . as it relates to the overall operation." (Winter Depo. Tr. 37:24-38:5; 45:16-19.)  He also testified that he has a general knowledge of the different classifications of retailers in the industry.  (*Id.* at 45:16-24.)  Moreover, Winter testified that he has "always been aware of Ecolab since [his] college days." (*Id.* 38:9-10.)  Based on his testimony, Winter has personal knowledge of the hospitality operations industry.

Moreover, with respect plaintiffs' argument that "Ecolab never disclosed the identities of two of the Ecolab 'Executives/Managers' who offered declaration, defendant counters that Moechnig, Meyers, and Melnyk were not only identified in Ecolab's initial disclosures as having knowledge of Ecolab, they were each subsequently deposed by plaintiffs as Ecolab's Rule 30(b)(6) witnesses.  Thus, there is no dispute that their identities had been disclosed and that plaintiffs had an opportunity to, and in fact did, thoroughly examine these witnesses.  Although the Regulations indicate that employers may not "exempt themselves from the requirements of the Act," there is no explicit prohibition of the court's consideration of testimony by the employer or its executives and/or employees. *See Owopetu II*, 2011 WL 4433159, at *5 (considering affidavit from defendant's Corporate Office Manager in "recognized as retail" determination).

Accordingly, the court finds the affidavits of Winter, Moechnig, Meyers, and Melnyk, who have all laid proper foundations for their knowledge by indicating in their sworn declaration that they have both personal knowledge of the industry and of Ecolab, are admissible and sufficient to establish that Ecolab is recognized as retail. Plaintiff, however, has failed to provide any evidence in the form of sworn testimony or otherwise to raise a factual dispute as to defendant's showing that Ecolab is recognized as retail in the industry. Construing all inferences in favor of plaintiffs, the court finds that there is no issue of material fact with respect to whether Ecolab is recognized as retail in the industry. *See Owopetu II*, 2011 WL 4433159, at *5 (finding, where plaintiff provided no evidence to the contrary, that evidence in the form of two additional affidavits from defendant's Corporate Office Manager and a professional vocational rehabilitation consultant sufficient to establish that defendant corporation was recognized as retail in the industry).

## CONCLUSION

For reasons set forth herein, defendant's motion for summary judgment is granted on the ground that plaintiffs are commissioned salespersons under 29 U.S.C. § 207(i), and plaintiffs' cross-motion for partial summary judgment is

denied.[11]   In light of the court's determination under Section 7(i), the court need not reach a determination on the merits with respect to whether plaintiffs are exempt as "outside salesmen" under 29 U.S.C. § 213(a).

The parties are ordered to submit a joint status letter in writing no later than October 7, 2015, as to how they intend to proceed.

**SO ORDERED.**

_____
                    /s/
**KIYO A. MATSUMOTO**
United States District Judge

Dated: Brooklyn, New York
       September 30, 2015

---

[11] The court has considered the parties' recent submissions regarding Judge Chang's September 3, 2015 decision in *Schneider v. Ecolab*, and respectfully n that Judge Chang's careful analysis and determination of the Illinois Minimum Wage Law claims in *Schneider* with respect to the application of the analogous federal Section 207(i) exemption was predicated upon a different record, and, in any event, does not affect the outcome of this case. (*See* ECF Nos. 221, Plaintiffs' Letter re Decision in *Schneider*; 224, Defendant's Letter re Unsealing of *Schneider*; 226, Defendant's Letter re *Schneider* dated 9/17/15; 227, Plaintiffs' Letter re *Schneider* dated 9/17/15; 235, Plaintiffs' Reply Letter dated 9/24/15; 236, Defendant's Reply Letter dated 9/24/15.)  Like Judge Chang in *Schneider*, this court finds that disputed issues of material fact preclude a finding that plaintiffs, as Route Sales Managers, are "outside salespersons."  As to the determination of whether plaintiffs are "commissioned salespersons" under FLSA Section 207(i), the court finds, based on the undisputed facts in the record before this court, that defendant has sufficiently established that plaintiffs are commissioned salespersons and that Ecolab is a "retail or service establishment" under Section 207(i) because at least 75% of its sales and products is not for resale.  Thus, the court respectfully declines to follow Judge Chang's well-reasoned decision in *Schneider* with respect to the issue of whether plaintiffs are "commissioned salespersons" and whether Ecolab is a "retail or service establishment" under Section 207(i).