ANTHONY CHARLOT, ALAN
REMACHE, JOSE TEJADA,
GREGORY GERMUSKA, GARWYN
RICHMOND, MATT RIGGS,
CHRISTOPHER HENDLEY, AND
KRISTOFFER WRIGHT,

      **Plaintiffs,**

      v.

ECOLAB, INC.,

      **Defendant.**

Civ. No. 18-10528 (KM) (MAH)

**OPINION**

**KEVIN MCNULTY, U.S.D.J.:**

    This motion for class certification arises from the decision of Defendant
Ecolab, Inc. to classify certain of its employees as exempt from the overtime-
wage requirements of New Jersey state law. The employees believe that they are
primarily service technicians, entitled to overtime pay; Ecolab maintains that
they are primarily salespeople. Plaintiffs move for class certification and seek to
represent a putative class whose members allegedly suffered uniform harm
because they were all misclassified by Ecolab. Ecolab alleges that this case is
not appropriate for class certification. For the reasons that follow, the motion
for class certification is **GRANTED**.

## I.   BACKGROUND[1]

### A. The Parties

#### 1. Ecolab

    Ecolab, Inc., a Delaware corporation headquartered in Minnesota, sells
commercial sanitation products. (DE 1 ¶¶ 18–19; DE 388-22 ¶¶ 2–5). Ecolab

---

[1]    "DE ___" refers to the docket entry number in this case.

contracts with its customers to install its equipment and keep it in good working order by providing routine and emergency maintenance. (DE 388-4 at 3; DE 388-20 ¶¶ 11 & 20; DE 388-7 at 113:13–17). In return, Ecolab's clients commit to exclusively purchase Ecolab's chemical cleaning products. (DE 388-4 at 1–2).

### 2. Proposed Class Representatives.

Plaintiffs Alan Remache and Kristoffer Wright worked in New Jersey for two Ecolab divisions that sell specialized cleaners and sanitizers to the hospitality industry. (DE 388-7 at 39:14–25; DE 388-20 ¶ 2; DE 388-3 at 20:25–22:1). They were employed by Ecolab as dishwasher repair technicians, positions that Ecolab refers to as "route sales managers" and "service and sales route managers" (collectively, "route managers" or "RMs"). RMs install, maintain, and repair commercial dishwashers as provided in the lease agreements Ecolab signs with its customers. (DE 388-10 at 61:3–6; 70:7–8; DE 388-3 at 122:4–12; 148:13–18; 159:14–21; 167:8–13).

The two named New Jersey plaintiffs are former Ecolab RMs. Remache worked for Ecolab as an RM in New Jersey from approximately February 2012 to February 2013. (DE 388-6 at 75:14–24). Wright worked for Ecolab as an RM in New Jersey from approximately 2003 through October 2012. (DE 388-7 at 17:25–18:4 & 206:7–9).

---

DE 388-__ = Exhibits accompanying Plaintiffs' motion to certify the class.

DE 393-__ = Exhibits accompanying Ecolab's opposition to the motion.

DE 394-__ = Exhibits accompanying Plaintiffs' reply.

Where the parties filed more than one exhibit under the same docket number, both the docket number and the exhibit number are cited. *E.g.*, DE 393-# Ex. #.

Plaintiffs filed exhibits 10, 16, 17, 21–23, 25–30, 32–34, 36 & 39–42 under seal. (DE 388). In the interest of uniformity, any citation within this opinion to those exhibits refers to the sealed record, which is located at DE 388. (The declaration of Molly Brooks (DE 388-2) serves as an index.) The unsealed exhibits are located at DE 389.

The proposed class consists of anyone who was employed by Ecolab in New Jersey as a route manager, route sales manager, or service and sales route manager between September 11, 2010 and the present. (DE 388-46). Approximately 106 people meet those criteria. (DE 388-8).

## B. Factual Background

### 1. Classification of RMs and the New Jersey Wage and Hour Law

New Jersey's Wage and Hour Law ("NJWHL") incorporates certain exemptions of the federal Fair Labor Standard Act ("FLSA"), which allow employers to avoid paying overtime wages to exempted employees. *See* N.J. Admin. Code § 12:56-7.2(a).[2] In particular, it incorporates the outside-sales exemption, which applies to employees whose primary duty is sales and who are "customarily and regularly engaged away from the employer's place or places of business in performing such primary duty." 29 C.F.R. § 541.500.[3]

Ecolab classifies all New Jersey RMs based on a uniform job description and compensation plan—without an individualized inquiry into the RMs duties—as exempt from the NJWHL's overtime provisions. (DE 388-9 ¶ 2). As a result, it does not pay overtime wages—across the board—to any RM for hours worked overtime. (DE 388-5 at 18:6–19:8; DE 388-9 ¶ 2).

### 2. Ecolab's Non-RM Salesforce

Aside from its RM workforce, Ecolab employs a salesforce dedicated to selling Ecolab's products and leases for those products. This salesforce includes territory managers, street sales development managers, sales

---

[2]    Before September 2011, the New Jersey outside-sales exemption did not apply to employees who spent more than twenty percent of their time in non-sales work. N.J. Admin. Code § 12:56-7.4 (2011). Because the prior version of the regulation provided a narrower exemption, class members who are non-exempt under the current exemption would also be exempt under the prior exemption.

[3]    In 2011, New Jersey amended N.J. Admin. Code § 12:56-7.2 to include a so-called "administrative exemption." This provision exempts employees if (a) their primary duty was sales activity; (b) at least 50% of their compensation came from commissions; and (c) total compensation exceeded $400 per week. *Id.* § 12:56-7.2(b).

development managers, distributor sales and development managers, area route managers, account executives, corporate account managers, and vice presidents. (DE 388-3 at 108:21–109:19 & 111:22–112:16; DE 388-10 at 44:3–46:22; DE 388-11 at 35:2–10 & 48:12–49:2 & 87:4–88:10 94:4–95:9 & 99:20–100:7; DE 388-28; DE 388-29; DE 388-30). These employees' responsibilities include selling leases and products to existing clients and cold-calling prospective clients. (DE 388-11 at 48:12–49:2 & 87:4–88:10 & 87:11–19; DE 388-27).

These non-RM employees are further divided into salespeople, who sell leases to individual customers, and corporate account representatives, who negotiate agreements for corporate accounts:

> Ecolab has two types of accounts: (1) independent operators, or 'street' accounts and (2) corporate accounts. Street accounts, though not an official name, refer to independent operators with one location or unit, whereas corporate accounts are multi-location customers that are owned or operated by a centralized management team.

(DE 237 at 10). Ecolab's corporate account representatives interact with people at the customer's headquarters and are responsible for corporate accounts. (DE 388-10 at 43:9–14). A corporate agreement usually governs services for multiple locations and may contain uniform rebates or discounts for all covered locations. (DE 388-10 at 116:3–22). As part of these corporate agreements, Ecolab offers installation, maintenance, replacement parts, and repairs twenty-four hours a day, seven days a week. (DE 388-4 at 3).

Ecolab's fulltime salesforce "pushes" new sales opportunities; an RM's position, by contrast, is designed to "pull" sales from regular on-site visits to Ecolab's customers. (DE 393-3 Ex. 4 at 130:19–131:7; DE 393-7 Ex. 15 ¶¶ 13 & 16; DE 393-8 Ex. 16 ¶¶ 6 & 7; DE 393-8 Ex. 18 ¶ 6). Under this model, existing customers can order supplies either through RMs, through Ecolab's service center, or through an outside distributor. (DE 393-8 Ex. 19 ¶ 11).

4

### 3. Ecolab's Products and Distributors

If a customer elects to place an order through an RM, the RM is responsible to ensure that the order is delivered to the customer by Ecolab or by a distributor. (DE 393-8 Ex. 19 ¶ 11).

In fact, many Ecolab customers obtain Ecolab products from distributors and not from RMs. (DE 388-6 at 139:5–140:23; DE 388-7 at 129:22–130:19; DE 388-10 at 25:3–15 & 27:23–28:18; DE 388-14 at 48:16–23; DE 388-15 at 51:15–22; DE 388-45). These so-called "indirect" product sales are fulfilled by third parties and not by Ecolab employees. (DE 388-11 at 218:16–219:7). Distributors account for over half of Ecolab's sales; in New Jersey in particular, more than half of the RMs' accounts obtain Ecolab products from distributors. (DE 388-6 at 139:5–140:23; DE 388-7 at 129:22–130:19; DE 388-14 at 48:16–23; DE 388-15 at 51:15-22; DE 388-45). Regardless of the sale's source, however, in recognition of the RM's existing and ongoing relationships with the customer, Ecolab awards a commission to the RM assigned to the account. Thus even sales through distributors generate commissions for the RM assigned to the account. (DE 388-12; DE 388-3 at 90:12-19; DE 388-45; DE 393-2 Ex. 1 at 25:1–27:1 & 29:9–19; DE 393-6 Ex. 13 at ¶¶ 14 & 31).).

### 4. Leases

Ecolab's leases commit it to install, train, maintain, and repair the commercial equipment leased to its customers. (DE 388-4 at 3). RMs provide these services. When an Ecolab customer signs a lease, the customer is assigned to a route, and the RM working the route takes responsibility for installing the equipment, training the staff, making monthly maintenance calls to ensure the equipment's proper operation, and responding to emergency repair call twenty-four hours a day, seven days a week. (DE 388-3 at 122:4–12 & 148:13–18 & 159:14–21 & 167:8–13; DE 388-10 at 61:3–6 & 70:7–8; DE 388-7 at 113:13–17; DE 388-20 ¶¶ 11 & 20).

Ecolab leases also include a commitment by the customer to purchase a set amount of Ecolab products each month. (DE 388-41). Before an account is

assigned to an RM, Ecolab's non-RM salespeople negotiate the product-purchase commitment with the customer. (DE 388-21 ¶ 4).

### 5. RMs' Job Duties

The members of the proposed class of New Jersey RMs had identical job titles, descriptions, codes, and classifications. For instance, every RM was responsible for routine preventive maintenance ("RPM") (DE 388-4 ¶¶ 7 & 14 & 15), emergency service requests ("ESR") (DE 388-3 at 167:8–13), and equipment installation (DE 388-4 ¶ 9). All class members had the same duties and responsibilities, which they were required to perform pursuant to uniform rules and instructions. (DE 388-4 at 4–5).

Ecolab's RMs primarily service accounts by installing, maintaining, and repairing commercial equipment along their routes. (DE 388-3 at 143:11–149:5; DE 388-6 at 133:15–135:1; DE 388-11 at 156:12–157:25 & 171:2–22). RMs spend the vast majority of their time carrying out these tasks. (DE 388-7 at 112:22–114:6; DE 388-11 at 207:14–209:5; DE 388-43; DE 388-13; DE 388-14 at 306:10–18; DE 388-20 ¶¶ 5 & 9–14; DE 388-15 at 70:10–74:2 & 132:20–22; DE 388-21 ¶¶ 5–15). Each RM is assigned approximately one hundred to one-hundred-twenty accounts. (DE 388-4 at 4; DE 388-6 at 134:10–16; DE 388-7 at 131:18–21; DE 388-11 at 181:12–18 & 182:3–9; DE 388-14 at 61:23–62:2; DE 388-15 at 50:9–51:14; DE 388-16 at 46:7–20).

Each Ecolab lease provides for regular visits by the RM—visits that Ecolab refers to as routine preventative maintenance ("RPM").[4] (DE 388-3 at 148:13–149:7 & 158:6–21; DE 388-4 at 3–5; DE 388-22 ¶¶ 13–14). Also pursuant to the leases, RMs are required to respond to emergency service requests ("ESR"), to install and reclaim equipment, and to train customers' employees to use Ecolab equipment. (DE 388-4 at 2–3; DE 388-13 ¶ 8; DE 388-21 ¶¶ 6–15; DE 388-23.).

---

[4]     In April 2016. Ecolab changed the term for RPM to "Regular Service Calls." (DE 388-13).

RPM requires the RM to travel to a client's business location, check and record chemical ratios, check for proper product usage, inspect the dishwasher, disassemble and reassemble machines per the service protocol, enter meter readings, titrate chemicals and dispensers, and record results. (DE 388-3 at 158:14–160:11; DE 388-13; DE 388-21 ¶ 10; DE 388-24). RMs regularly work more than forty hours a week on such maintenance work. (DE 388-6 at 79:16–80:3; DE 388-7 at 424:19–425:20; DE 388-14 at 174:6–9; DE 388-15 at 132:20–25).

In addition to RPM, Ecolab requires RMs to remain on-call to respond to ESRs within sixty minutes of a customer call, and they must be available to do so twenty-four hours a day, seven days a week. (DE 388-3 at 171:21–174:3 & 183:2–185:22; DE 388-6 at 255:3–256:5; DE 388-11 at 184:3–185:17 & 207:14–209:5; DE 388-15 at 95:8–11; DE 388-20 ¶ 13; DE 388-42).

An ESR often requires the RM to perform mechanical work, such as replacing dishwasher motors or other parts and disassembling and reassembling machines. (DE 388-6 at 361:16–22; DE 388-14 at 40:25–41:10; DE 388-15 at 116:10–21; DE 388-16 at 75:17–77:19 & 105:22–108:3; DE 388-21 ¶ 15; DE 388-25). ESRs often involve plumbing and electrical work. (DE 388-6 at 265:15–266:8; DE 388-13; DE 388-14 at 166:8–12; DE 388-16 at 56:9–25 & 106:8–108:3; DE 388-3 at 147:22–148:4). Ecolab quality-controls its RMs' ESR response rates by calling customers to ensure that the RMs timely responded. (DE 388-3 at 171:21–174:3).

To ensure that it hires a workforce that is capable of carrying out the necessary tasks, Ecolab's job description for RMs demands "hands-on mechanical ability, which includes electrical, plumbing, and mechanical experience and problem-solving skills to troubleshoot and repair equipment and dispensing systems." (DE 388-44). The posted job requirements also include the ability to lift and carry seventy-five-pound loads, but the advertised requirements do not require sales experience. (DE 388-44).

When a member of the Ecolab sales team sells a new lease, Ecolab requires an RM to install the equipment at the customer's location(s). (DE 388-

3 at 122:4–12; DE 388-7 at 53:17–24; DE 388-13; DE 388-15 at 98:21–99:8; DE 388-16 at 56:3–8; DE 388-20 ¶ 5; DE 388-21 ¶ 5). Installations sometimes take more than an entire eight-hour workday and may also require assistance from RMs assigned to other routes. (DE 388-21 ¶ 8; DE 388-15 at 99:1–12 & 115:15–116:5; DE 388-3 at 148:5–12). Ecolab also requires RMs to reclaim machines when leases expire, a task that involves similar plumbing and electrical work. (DE 388-21 ¶ 9; DE 388-11 at 210:4–10; DE 388-3 at 143:11–22).

The company also requires RMs to train Ecolab customers' employees how to use its commercial equipment and chemical products. (DE 388-4 at 2–3; DE 388-11 at 216:3–21; DE 388-3 at 181:5–13). RMs occasionally also perform service and repair work on routes that border their own. (DE 388-3 at 183:2–185:22; DE 388-11 at 184:3–185:17; DE 388-20 ¶¶ 10 & 13). During weekend rotations, RMs remain on-call to provide around-the-clock emergency service to customers on other RMs' routes while simultaneously servicing their own. (DE 388-4 at 2–3; DE388-11 at 207:14–208:11; DE 38-3 at 177:7–16; DE 388-20 ¶ 14; DE 388-26; DE 388-6 at 154:15–156:6). As a result of all the service and repair work Ecolab assigns them, RMs regularly work more than forty hours in a week. (DE 388-6 at 79:11-18 & 153:10–154:2 & 155:8–156:6; DE 388-7 at 424:19–426:5; DE 388-14 at 174:6–9; DE 388-15 at 132:20–25; DE 388-20 ¶ 23; DE 161 ¶ 217).

### 6. RMs' Training

Ecolab requires all RMs to complete the same three-month training program. (DE 388-10 at 63:19–66:4). The Ecolab RM training consists of electrical and plumbing classes that cover the installation and repair of Ecolab's dishwashers. (DE 388-3 at 147:22–148:4; DE 388-38). Ecolab also requires all RMs to take specific online training, and Ecolab monitors each RM's progress. (DE 388-3 at 181:17–25; DE 388-10 at 66:18–67:9; DE 388-11 at 225:18–226:11; DE 388-39).

Some RMs do not pursue sales training. (DE 393-4 Ex. 7 at 61:21–62:7 & 64:16–65:1 & 72:10–73:8; DE 393-2 Ex. 2 at 40:23–25; DE 393-12 Ex. 35; DE 393-10 Ex. 29; DE 393-12 Ex. 36; DE 393-10 Ex. 28). Some view sales as Ecolab's goal, not one that they were hired to pursue. (DE 393-4 Ex.6 at 277:5–15). Others actively pursue sales, seeing the RM role as one that requires both service and sales. (DE 393-2 Ex. 2 at 12:22–13:18; DE 393-4 Ex. 5 at 41:18–42:9). Some RMs come into the position with only sales experience and no technical experience. (DE 393-2 Ex. 2 at 43:2–12).

### 7. Supervision and Evaluation of RMs

Ecolab's district managers ("DM") supervise RMs. In 2017, there were thirteen DMs in New Jersey, responsible for forty individual territories; as of April 2019, there were eighteen DMs covering forty-eight territories. (DE 393-8 Ex. 19 at ¶¶ 5–6; DE 393-14 Ex. 44 ¶¶ 4–5). DMs assign their RMs different objectives and goals. (DE 393-4 at 237:24–239:3; DE 393-4 Ex. 6 at 305:23–306:6; DE 393-8 Ex. 18 ¶¶ 1 & 7; DE 393-8 Ex. 24 ¶ 5). Not all managers monitor RMs the same way, but RMs' service delivery reports ("SDRs") are centrally tracked to ensure that RMs complete RPMs regularly. (DE 388-10 at 18:15–24).

Ecolab uses the same metrics and evaluation tools to track and evaluate all of the RMs' work. (DE 388-4 at 5–6). After every maintenance visit, an RM is required to file an SDR that describes the maintenance and repair work he or she performed. (DE 388-3 at 154:3–10 & 157:5–165:1; DE 388-10 at 19:6–15; DE 388-11 at 178:21–179:13; DE 388-23; DE 388-32 at 997). SDRs detail the RM's findings, and they also record any sales the RM made by ordering depleted or additional products and documenting recommendations of additional products. (DE 393-2 Ex. 1 at 19:6–15; DE 393-2 Ex. 2 at 63; DE 393-5 Ex. 8 at 154:10–14; DE 393-5 Ex. 9 at 60:8–16 & 61:21–62:19 & 67:9–68:19; DE 393-7 Ex. 15 at ¶ 19; DE 393-8 Ex. 16 at ¶ 10).

Each RM's tablet feeds data about his or her visits to Ecolab every day. (DE 388-3 at 160:13–161:19; DE 388-6 at 253:23–254:10; DE 388-10 at

18:25–19:15; DE 388-11 at 208:19–209:10). DMs use that data to review the RM's work and to determine whether the RM made a sufficient number of RPMs each week. (DE 388-3 at 175:15–176:7 & 216:11–217:18; DE 388-10 at 21:15–25; DE 388-11 at 113:21–114:12 DE 388-20 ¶¶ 18 & 19; DE 388-33 ¶¶ 13–14).

Ecolab uses data from SDRs to generate performance track reports, which measure the percentage of RPM calls and ESRs to which each RM responded. (DE 388-34; DE 388-21 ¶ 27; DE 388-11 at 268:9–270:8; DE 388-3 at 170:25–173:9). Ecolab also monitors both the time and quality of individual RMs' responses to ESRs. (DE 388-3 at 171:21–175:10; DE 388-11 at 208:21–209:10). In contrast, Ecolab does not track individual sales of RMs, how a sale was originated, or who originated the sale. (DE 388-3 at 153:11–156:22; DE 388-6 at 33:4–34:1; DE 388-10 at 26:5–17 & 51:10–18; DE 388-11 at 243:6–19; DE 388-40 at 3).

SDRs represent the confluence of RMs' sales and service responsibilities. (DE 393-14 Ex. A). However, despite Ecolab's formally requiring RMs to complete SDRs, RMs neither always nor uniformly complete them. (DE 393-8 Ex. 22 at ¶¶ 7–8). Some RMs use SDRs to merchandise and take orders, but others use them as a service tool. (DE 393-1 Ex. 2 at 72:11–21; DE 393-4 Ex. 5 at 100:1–8; DE 393-8 Ex. 21 ¶ 23; DE 393-8 Ex. 22 ¶ 18). Nonetheless, each required element of an SDR corresponds to service work—not the sales work—performed by the RM. (DE 388-32).

DMs also closely monitor RMs' hours and schedule. They review RMs' hour reports and review the monthly schedule of RPMs. (DE 388-3 at 216:11–217:18; DE 388-6 at 135:22–136:18; DE 388-11 at 266:12–267:5; DE 388-33 at ¶¶ 13 & 14). Ecolab supervisors reprimand RMs if they fall short of their hours requirements or do not complete enough RPMs. (DE 388-20 ¶ 18; DE 388-33 ¶¶ 13 & 14; DE 388-35; DE 388-36).

However, RMs have a lot of discretion in carrying out their duties. While Ecolab expects RMs to track hours via the company's ESM program, tracking is managed at the local level, and not all RMs abide by it. (DE 393-2 Ex. 2 at

136:23–137:12; DE 393-3 Ex. 3 at 27:2–12 & 28:14–23; DE 393-4 Ex. 6 at 206:3–207:25; DE 393-4 Ex. 7 at 307:12–308:16; DE 393-5 Ex. 8 at 88:14–17 & 91:14–92:15; DE 393-8 Ex. 20 ¶ 13).

Some RMs view the position as one that requires little more than maintenance of existing accounts, while others focus on growing sales in assigned territories. (DE 393-2 Ex. 2 at 56–57; DE 393-4 Ex. 6 at 40:4–15 & 43:2–44:24 & 105:1–9 & 159:20–160:23; DE 393-8 Ex. 24 at ¶¶ 8–9). For instance, Plaintiff Remache served as a DM and supervised RMs. (DE 393-5 Ex. 8 at 25:20–23). Remache testified that the RMs who reported to him performed their tasks differently, regardless of how he trained them: some reached sales goals, some did not; each had varying levels of ability, skill, and experience; and Remache's supervision varied according to the individual's performance, relationship with customers, and skill in selling or servicing equipment. (DE 393-5 Ex. 8 at 372:16–373:5 & 401:5–22 & 812:3–814:3; DE 393-8 Ex. 18 ¶ 9).

Ecolab does not track RMs' sales, but DMs do monitor "call coverage"— i.e., whether RMs are regularly performing RPMs. (DE 388-3 at 154:6–156:22; DE 388-6 at 33:19–35:3; DE 388-10 at 26:5–17; DE 393-8 Ex. 18 ¶ 10; DE 393-8 Ex. 23 ¶ 18; DE 393-8 Ex. 24 ¶ 16). Ecolab requires all RMs to respond to ESRs, and Ecolab imposes a sixty-minute response time limit. (DE 388-6 at 255:10–256:5; DE 388-11 at 208:12–210:2; DE 388-14 at 165:8–166:14; DE 393-2 Ex. 2 at 64:9–66:3). Ecolab does not dispute that each RM spends the vast majority of his or her time making RPM calls and responding to ESRs, is required to perform preventive maintenance and repairs on the calls, and is required to record this work on SDRs that Ecolab monitors.

### 8. Ecolab's Compensation Plan for RMs

Ecolab applies the same timekeeping policies to all New Jersey RMs. (DE 388-5 at 28:14–23). Pursuant to the terms of Ecolab's uniform compensation plan, the compensation for RMs has three components: a base salary; a fixed percentage of the invoiced amount on the service accounts assigned to each

RM; and a nominal bonus for "customer retention" and "sales productivity." (DE 388-17 at 4–5; DE 388-18; DE 388-19).

RMs exercise no control over the first two components of their compensation. Ecolab refers to the second component (the fixed percentage of monthly contracted service invoices) as "commissions," but RMs cannot control which accounts they are assigned (DE 388-15 at 106:23–107:9 & 119:22–120:11; DE 388-16 at 104:14–105:13; DE 388-20 ¶¶ 8 & 26; DE 388-10 at 82:16–83:12), and are neither expected nor authorized to negotiate leases (DE 388-15 at 113:9–12 & 133:13–25; DE 388-6 at 300:10–25; DE 388-16 at 53:11–19). To balance commissions evenly among RMs, Ecolab annually reassigns routes, along with the commissions that correspond to them. (DE 388-11 at 277:24–283:25). Redistribution is based on geography, traffic, weather, number of accounts, sales volume, market fluctuations, and growth expectations. (DE 388-3 at 235:3–10). Unlike many traditional commission-based businesses, route assignment is not based on merit; an RM's performance is only considered insofar as turnover may affect the capabilities of that or another RM. (DE 388-3 at 235:14–18). Geography is the primary criterion when Ecolab transfers a route between RMs. (DE 388-11 at 271:11–272:5). Ecolab also does not record whether an RM has a relationship with a particular client. (DE 388-10 at 76:18-22).

Ecolab's leases typically have a one-year term, and they renew automatically. RMs do not negotiate leases, because leases are negotiated and sold by Ecolab's sales force. (DE 388-10 at 44:24–45:7). An RM's income from these leases remains steady, because the leases include purchasing minimums for the accounts, and if the customer does not purchase the minimum amount, Ecolab charges the customer the difference between the contract amount and the actual amount spent. (DE 388-4 at 2; DE 388-16 at 120:2–5). RMs' "commissions" are based on the overall volume of products that their customers order, regardless of whether any RM facilitated the purchase. (DE 388-3 at 58:19–59:5, 208:22–209:7; DE 388-6 at 33:4–34:1; DE 388-10 at 26:15–17 & 88:12–95:2 & 112:3–114:3; DE 388-15 at 164:8–165:2; DE 388-16

12

at 34:8–25; DE 388-20 ¶ 25). RMs may receive commissions on leases and products purchased before the account was assigned to them and on accounts they have never visited. (DE 388-3 at 58:12–59:5; DE 388-10 at 112:3–114:3; DE 388-16 at 35:1–14; DE 388-21 at ¶ 4).

Ecolab records products delivered by Ecolab as "direct" sales and records sales to customers delivered via distributors as "indirect" sales. (DE 393-6 Ex. 12 at 27:14–16). The company attributes both types of sales to RMs, because the RM controls the client relationship and the ongoing commitment to buy Ecolab products. (DE 393-2 Ex. 1 at 29:9–19; DE 393-6 Ex. 12 ¶ 9; DE 393-7 Ex. 14 ¶¶ 9–13; DE 393-8 Ex. 17 ¶¶ 9–12).

Ecolab also employs so-called full-service specialists, who exclusively repair and install dishwashers, but who have no sales responsibility. (DE 393-8 Ex. 24 ¶ 15; DE 393-7 Ex. 15 ¶ 21; DE 393-3 Ex. 4 at 29:12–17 & 50:24–25 & 51:3–13 & 53:19–22 & 58:10). Some territories might even engage independent contractors to install dishwashers. (DE 393-3 Ex. 4 at 29:12–17 & 51:3–13 & 52:16–24 & 58:10–14; DE 393-6 Ex. 11 at 144:15–145:7 & 147:3–12; DE 393-7 Ex. 15 ¶ 21; DE 393-8 Ex. 16 ¶¶ 12). Nonetheless, every RM is required to install Ecolab machines and to respond to service calls. (DE 393-8 Ex. 21 ¶ 28; DE 388-20 ¶¶ 12 & 22; DE 388-15 ¶ 9; DE 393-7 Ex. 15 ¶¶ 20–21; DE 393-8 Ex. 21 ¶ 26; DE 393-8 Ex. 22 ¶ 16; DE 388-20 ¶ 5; DE 388-33 ¶ 4).

## C. Procedural History

On September 11, 2012, several RMs sued in the U.S. District Court for the Eastern District of New York under docket number 2:12-cv-04543. (DE 1). Those RMs asserted claims under the federal Fair Labor Standards Act ("FLSA") on behalf of Ecolab employees nationwide and also brought claims under the labor laws of Illinois, New Jersey, New York, North Carolina, Pennsylvania, and Washington. (DE 1 & DE 341 at 2–3).

With respect to the named plaintiffs only, the parties agreed to cross-move for summary judgment on the "retail or service establishment" exemption

of the FLSA, 29 U.S.C. § 207(i). [5] The parties filed their cross-motions for summary judgment on December 22, 2014. (DE 106 & 171). On September 30, 2015, Judge Kiyo Matsumoto granted Ecolab's motion and denied that of Plaintiffs. (DE 237). Judge Matsumoto's ruling rested solely on the FLSA; it did not address the New Jersey plaintiffs' NJWHL issues.

In April 2016, Ecolab again moved for summary judgment and moved to strike from the amended complaint the class and collective claims. On March 29, 2017, Judge Matsumoto granted the motion for summary judgment on all FLSA claims and on all non-New Jersey state-law claims. (DE 310). Consequently, only Plaintiffs' New Jersey state law claims remained.

On February 17, 2017, Plaintiffs moved to certify the class in the Eastern District of New York. (DE 302). Judge Matsumoto ordered the parties to mediate. Mediation failed, and on June 13, 2018 the action was transferred—still uncertified—to the District of New Jersey. (DE 344). The parties have since updated the evidentiary record. (DE 369 at 5-6).

## II.  LEGAL STANDARD

The class action is "an exception to the usual rule that litigation is usually conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (citing *Califano v. Yamaski*, 442 U.S. 682, 700–01 (1979)). Accordingly, a plaintiff bears the burden of

---

[5]     Section § 207(i) further carves out the overtime requirements:

> No employer shall be deemed to have violated subsection (a) by employing any employee at a retail or service establishment for a workweek in excess of the applicable workweek specified therein, if (1) the regular rate of pay of such employee is in excess of one and one-half times the minimum hourly rate applicable to him under [29 U.S.C. § 206] and (2) more than half his compensation for a representative period (not less than one month) represents commissions on goods or services. In determining the proportion of compensation representing commissions, all earnings resulting from the application of a bona fide commission rate shall be deemed commissions on goods or services without regard to whether the computed commissions exceed the draw or guarantee.

29 U.S.C. § 207(i).

affirmatively demonstrating by a preponderance of evidence that her putative class satisfies the class-certification requirements in Federal Rule of Civil Procedure 23. *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015). Importantly, Rule 23 "does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011). Rather, the plaintiff must prove that the Rule 23(a) requirements are met. *Comcast*, 569 U.S. at 33.

First, to qualify for class certification, a party must demonstrate that the putative class meets the four requirements set forth in Rule 23(a), known as numerosity, commonality, typicality, and adequacy of representation:

(1)    the class is so numerous that joinder of all members is impracticable [numerosity];

(2)    there are questions of law or fact common to the class [commonality];

(3)    the claims or defenses of the representative parties are typical of the claims or defenses of the class [typicality]; and

(4)    the representative parties will fairly and adequately protect the interests of the class [adequacy of representation].

Fed. R. Civ. P. 23(a); *see also Dukes*, 564 U.S. at 345.

The Supreme Court has emphasized that it "may be necessary for the court to probe behind the pleadings before coming to rest on the certification question" and that certification is proper only if "the trial court is satisfied, after a rigorous analysis" that Rule 23(a)'s prerequisites have been met. *Comcast*, 569 U.S. at 33 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160-61 (1982)). Such an analysis will "entail some overlap with the merits of the plaintiff's underlying claim." *Dukes*, 564 U.S. at 351.

Second, plaintiffs must satisfy at least one of the three bases for class treatment listed in Rule 23(b). *Id.* at 345–46. Here, the RMs seek to certify the class under Rule 23(b)(3), which permits certification when (1) "the questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P.

23(b)(3). The Rule 23(b)(3) analysis of predominance and superiority is more demanding than the Rule 23(a) analysis. *See Comcast*, 569 U.S. at 34 (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623–24 (1997)). In particular, courts have a duty to take a close look at whether common questions predominate over individual ones. *Dukes*, 564 U.S. at 362.

In the Third Circuit, Rule 23(b)(3) certification also involves an independent "ascertainability" inquiry. A plaintiff is required to show that (1) the class is "defined with reference to objective criteria" and (2) there is "a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *Byrd*, 784 F.3d at 163 (citing *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 355 (3d Cir. 2013)). The parties do not seem to dispute this issue, however; Ecolab relegates to a footnote its argument against the class's ascertainability. (DE 393 at 30 n.113).

## III.   DISCUSSION

Because this matter involves a controversy between citizens of different states and the amount in controversy is alleged to exceed the sum of $75,000, this Court has jurisdiction pursuant to 28 U.S.C. § 1332(a).[6] New Jersey substantive law will apply. *See Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938).

### A. The New Jersey Wage and Hour Law

New Jersey law imposes minimum-wage and overtime-payment requirements on employers, except as to certain specified categories of employees. *See* N.J. Stat. Ann. § 34:11-56a. Among those categories of exempted employees are "persons employed as outside salesmen as such terms shall be defined and delimited in regulations adopted by the commissioner . . . ." N.J. Stat. Ann. § 34:11-56a4(a). An employer bears the burden of proving that the outside-sales exemption applies. *See In re Raymour & Flanigan Furniture*, 405 N.J. Super. 367, 377 (App. Div. 2009)..

---

6       The parties do not rely on the diversity rules of the Class Action Fairness Act, 28 U.S.C. 1332(d).

The Division of Wage and Hour Compliance of the New Jersey Department of Labor has adopted the FLSA's definition of outside-sales employees. *See* N.J. Admin. Code § 12:56-7.2. Because the NJWHL overtime-compensation and minimum-wage requirements are modeled after and nearly identical to their analogous FLSA regulations, judicial opinions construing the FLSA apply. See *Thompson v. Real Estate Mortg. Network, Inc.*, 106 F. Supp. 3d 486, 491 (D.N.J. 2015). ("The FLSA includes a right of action to recover withheld overtime payments; the principle of parallel construction suggests that the NJWHL be interpreted the same way.").

Overtime exemptions to the FLSA must be given a "fair reading" in determining whether they apply to an employee. *Encino Motorcars v. Navarro*, 138 S. Ct. 1134, 1142 (2018). To determine whether an individual's "primary duty" is exempt sales work, the relevant inquiry is whether making sales or obtaining orders was the employee's "principal, main, major or most important duty." 29 C.F.R. § 541.700(a). "Employees have a primary duty of making sales if they 'obtain a commitment to buy' from the customer and are credited with the sale." 69 Fed. Reg. 22163 (April 23, 2004). The amount of time spent on sales is not dispositive; rather, the "major emphasis [is] on the character of the employee's job as a whole." 29 C.F.R. § 541.700(a).104

"Unsurprisingly, determining whether an employee is exempt involves a fact intensive inquiry." *In re Morgan Stanley Smith Barney LLC Wage & Hour Litig.*, No. 11-3121, 2016 WL 1407743 at *5 (D.N.J. Apr. 11, 2016). A "job title is not determinative of whether an employee is exempt; an employee's exempt status depends on the actual duties he or she performs. *See also* 29 C.F.R. § 541.2 ("job titles insufficient"), *adopted by* N.J.S.A. § 12:56-7.2(a). Courts also consider "external indicia" of sales, to determine whether sales, as opposed to another duty, is the primary duty. *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2172 (2012).

## B. Rule 23(a) Requirements

A plaintiff seeking to certify a class first must satisfy Rule 23(a)'s four requirements: numerosity, commonality, typicality, and adequacy of representation. *See* Section II, *supra*. All must be proven by a preponderance of the evidence. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307 (3d Cir. 2008).

### 1. Numerosity

Rule 23(a)(1) requires a finding that "the class is so numerous that joinder of all members is impracticable." That requirement promotes judicial economy by avoiding onerous (anti-)joinder rules and eliminating the need to adjudicate numerous similar actions separately. *See Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 594–95 (3d Cir. 2012). Furthermore, it enhances access to judicial relief, particularly when individual claims would be uneconomical to litigate individually, and, where joinder can be easily accomplished, prevents putative class representatives and counsel from denying members of a small class from adjudicating their claims individually. *Id.*

As a general rule, a potential class with as few as forty members may meet the numerosity requirement. *Id.* at 595 (citing *Stewart v. Abraham*, 275 F.3d 220, 226–27 (3d Cir. 2001)). Nonetheless, Rule 23(a)(1) "requires examination of the specific facts of each case." *Gen. Tel. Co. of Nw. v. EEOC*, 446 U.S. 318, 330 (1980). Additionally, numerosity is not presumed for state-specific subclasses simply because there is a nationwide or larger class; there needs to be state-specific evidence of numerosity for each subclass. *Marcus*, 687 F.3d at 585.

Here, Plaintiffs and Ecolab have identified approximately 106 RMs who worked for Ecolab during the proposed class period. Those current and former RMs constitute the entire New Jersey class. That class size is large enough that joinder is impracticable, but not so large as to make notice impracticable. There are no other state-specific classes or subclasses, because Judge

Matsumoto dismissed all non-New Jersey state-law claims. Finally, Ecolab does not contest that the Rule 23(a)(1) numerosity requirement is met.

### 2. Commonality

Rule 23(a)(2) requires a showing of "questions of law or fact common to the class." "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Dukes*, 564 U.S. at 349–50 (citing *Falcon*, 457 U.S. at 157). The claims must rest upon a "common contention" that is capable of classwide resolution. *Id.* at 350.

Importantly, the commonality requirement does not require that class members share identical claims. *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 310 (3d Cir. 1998). "[F]actual differences among the claims of the putative class members do not defeat certification." *Id.* (citing *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994)). Commonality is addressed at a fairly high level of generality and is less stringent than the Rule 23(b)(3) predominance requirement. *See Amchem*, 521 U.S. at 609.

What is required is that the named plaintiffs share at least one question of fact or law with the prospective class. *See Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 382 (3d Cir. 2013). In fact, "the focus of the commonality inquiry is not on the strength of each plaintiff's claim, but instead is 'on whether the defendant's conduct was common as to all of the class members.'" *Id.* (citing *In re Prudential*, 148 F.3d at 311).

The Supreme Court has held that it is appropriate for district courts to look at the merits of a claim at the certification stage:

> Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule–that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc. . . . . "[S]ometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," [*Falcon*,] 457 U.S., at 160, and . . . certification is proper only if "the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied," *id.*, at 161; see *id.*, at 160, ("[A]ctual, not presumed,

conformance with Rule 23(a) remains . . . indispensable"). Frequently that "rigorous analysis" will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped. "'[T]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" *Id.*, at 160 (quoting *Coopers & Lybrand* v. *Livesay*, 437 U.S. 463, 469 (1978); some internal quotation marks omitted). Nor is there anything unusual about that consequence: The necessity of touching aspects of the merits in order to resolve preliminary matters, *e.g.*, jurisdiction and venue, is a familiar feature of litigation. See *Szabo* v. *Bridgeport Machines, Inc.*, 249 F.3d 672, 676–677 (CA7 2001) (Easterbrook, J.).

*Dukes*, 564 U.S. at 350–52.

In *Dukes,* for example, a class of one-and-a-half-million female Wal-Mart employees sought to sue the company for employment discrimination. *Id.* at 342. Wal-Mart's policy of vesting in local supervisors the authority to determine pay and promotion matters allegedly violated Title VII by discriminating against women. *Id.* The district court certified the class, but the Supreme Court disagreed with its application of the commonality requirement. *Id.* at 349. The Court warned that the commonality determination required a more probing inquiry than the district court had undertaken:

Th[e] language [of Rule 23(a)(2)] is easy to misread, since "[a]ny competently crafted class complaint literally raises common 'questions.'" [Richard] Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 131–132 (2009). For example: Do all of us plaintiffs indeed work for Wal-Mart? Do our managers have discretion over pay? Is that an unlawful employment practice? What remedies should we get? Reciting these questions is not sufficient to obtain class certification. Commonality requires the plaintiff to demonstrate that the class members "have suffered the same injury," *Falcon*, [457 U.S.,] at 157. This does not mean merely that they have all suffered a violation of the same provision of law. Title VII, for example, can be violated in many ways—by intentional discrimination, or by hiring and promotion criteria that result in disparate impact, and by the use of these practices on the part of many different superiors in a single company. Quite obviously, the mere claim by employees of

the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once. Their claims must depend upon a common contention—for example, the assertion of discriminatory bias on the part of the same supervisor. That common contention, moreover, must be of such a nature that it is capable of classwide resolution--which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

*Id.* at 349–50. The Court emphasized that a central feature of commonality is the existence of an *answer* that is common to the classwide issue:

What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather, the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." Nagareda, 84 N.Y.U. L. Rev. 97] at 132.

*Id.* at 350. Ultimately the *Dukes* Court's decision rested on the *absence* of a corporate policy:

The only corporate policy that the plaintiffs' evidence convincingly establishes is Wal-Mart's "policy" of *allowing discretion* by local supervisors over employment matters. On its face, of course, that is just the opposite of a uniform employment practice that would provide the commonality needed for a class action; it is a policy *against having* uniform employment practices."

*Dukes,* 564 U.S. at 355.

Such an absence of a corporate policy—and therefore the lack of a common issue of law or fact—is not a feature of the Ecolab Plaintiffs' claims. The most important question of fact or law —indeed the only relevant question—is whether Ecolab misclassified the RMs as exempt from overtime eligibility. It is Ecolab's stated, overall *corporate* policy to classify RMs as outside salespeople to whom the overtime provisions of the NJWHL do not apply. It is not, like the "policy" in *Dukes,* a mere abdication in favor of local discretion. Here, DMs do not have discretion regarding the classification of RMs or the authority to make wage-and-hour determinations. Rather, those

21

determinations are made at Ecolab's corporate headquarters. While employed by Ecolab, every RM is responsible for installing, maintaining, and repairing the company's dishwashers, but RMs are also allowed to sell the Ecolab's products. The issue on the merits, then, is whether an RM's primary duty is to sell products. If the answer is "yes," the members of the class are exempt from the NJWHL's overtime requirements; if the answer is "no," they are not. That yes-or-no question does not need to be answered yet; for now it suffices that Ecolab's uniform classification policy is common to all members of the proposed class and that its resolution will generate common answers. Rule 23(a)(2) and *Dukes* do not require more.

In fact, looking beyond the pleadings and into the merits only weakens Ecolab's argument with respect to commonality. Ecolab stresses the different approaches taken by various RMs to the sales aspect of their position. There is indeed evidence of such differences, but overall the evidence shows that RMs are primarily service technicians and that their duties are common across the class. Ecolab structures, closely monitors, and regularly evaluates the RMs' job performance as it relates to the installation, maintenance, and repair aspect of their jobs. Ecolab exercises no such oversight vis-à-vis sales. Insofar as sales are a part of an RM's job, that role is incidental to the service duties that are central to the position.

Moreover, RMs are all subject to identical compensation policies, creating class-wide incentives (or a lack thereof) to sell products and leases. Sales, even if they are not accomplished by RMs, result in commissions to RMs, and their routes are annually redistributed to achieve parity of labor and compensation among RMs. Even the most actively sales-focused RMs testified in a way that suggested that service work constituted the primary source of their duties and compensation. Thus, the evidence in the certification record reveals that even though the RM position surely involved sales, or at least the option to conduct sales, the question of whether Ecolab misclassified the RMs is common to all members of the proposed class.

22

Finally, it is highly suggestive that Ecolab employs a dedicated, full-time salesforce that does not include RMs. Ecolab makes the complementary observation that it relies upon independent contractors and employees who perform the service-related aspects of an RM's job but have no sales involvement. That evidence, however, is not as persuasive as Ecolab suggests. For one thing, the supplemental use of independent contractors does not affect the fact that every RM must service dishwashers on both a routine and emergency basis. In other words, there is no evidence in the record that Ecolab's alleged reliance on independent contractors *shifted* the responsibilities of some RMs from service to sales.[7] Moreover, not a single RM testified that any such outside help was available to him or her; that assertion came solely from Ecolab. To the extent that outside help is available, the testimony suggests that it is discretionary or even intermittent. In sum, a searching evaluation of the evidence at this, the certification stage, only strengthens Plaintiffs' argument that they are asserting a common issue as to whether Ecolab incorrectly classified them under the NJWHL.

Thus there exists a common, classwide question of law or fact: whether Ecolab misclassified the RMs as exempt from overtime eligibility under the NJWHL.

### 3. Typicality

The Rule 23(a)(3) test for typicality requires that the claims or defenses of the named plaintiffs be "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The typicality requirement is designed to align the interests of the class and the class representatives so that the latter will work to benefit the entire class through the pursuit of their own goals." *In re Prudential*, 148 F.3d at 311; *see also Rodriguez*, 726 F.3d at 376 n.4 (citing *Eisenberg v. Gagnon*, 766 F.2d 770, 786 (3d Cir. 1985)). Typicality does not require that the putative

---

[7]   Because the inquiry of Rule 23(a)(2) concerns commonality, presumably evidence that Ecolab's use of independent contractors shifted the responsibilities of *all* RMs from service to sales, the merits inquiry would remain common across the class.

class members all share identical claims. *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 531–32 (3d Cir. 2004). Rather, the typicality requirement, which tends to overlap with the commonality and adequacy determinations, seeks to assure that absent class members will be adequately represented. *Rodriguez*, 726 F.3d at 376 n.4; *Eisenberg*, 766 F.2d at 786.

Ecolab does not seriously dispute that the claims of Remache and Wright are typical of the remainder of the class. Ecolab merely insists in rather conclusory fashion that its commonality arguments (which I have now rejected) imply a lack of typicality as well: "For the same reasons Plaintiffs have not shown themselves to be representative of a class of [RMs] in New Jersey, their claims lack typicality because they have not shown them to arise from the same course of events and/or conduct as their putative class." (DE 393 at 29 n.112).

Here, Plaintiffs have satisfied the typicality requirement because the claims asserted by Remache and Wright arise from Ecolab's uniform alleged misclassification of the RMs. Remache and Wright purport to represent a class of 106 RMs, all of whom worked for Ecolab during the class period. Ecolab of course disputes these claims, but does not establish that the claims of Remache and Wright diverge significantly from those of the other class members. Accordingly, the across-the-board allegation that this corporate policy was erroneous is sufficient to satisfy Rule 23(a)(3). *See Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 183–84 (3d Cir. 2001) ("[T]ypicality is established regardless of factual differences . . . [if] the claims of the named plaintiffs and putative class members involve the same conduct by the defendant . . . .").

### 4. Adequacy of Representation

Rule 23(a)(4) requires that the "representative parties will fairly and adequately protect the interests of the class." The adequacy inquiry has two components designed to ensure that absent class members' interests are fully pursued: (1) whether counsel is qualified to represent the class and (2) whether

there are conflicts of interest between named parties and the putative class they seek to represent. *In re Warfarin*, 391 F.3d 532–33 (citing *In re Prudential*, 148 F.3d at 313).

Ecolab does not address whether Remache and Wright are adequate class representatives. It grumbles about, but accepts *arguendo*, Wright's status as a named plaintiff:

> On March 2, 2016, Plaintiffs sought to amend the complaint to add Wright as a plaintiff, representative of New Jersey [RMs]. [(DE 265)]. Ecolab moved to strike the collective and class allegations of the operative complaint, which was granted in March 2017. [(DE 269)]. Judge Matsumoto dismissed the claims of all individuals except Remache, an [RM], whose New Jersey state law claim survived. [(DE 310 & 311)]. Wright is not a named plaintiff in the operative complaint. *See* [(DE 337) Feb. 21, 2018 Order at 10)]. For the purposes of this Motion, however, Ecolab treats him as a proposed class representative.

(DE 393 at 19 n.102).

Plaintiffs point out that Remache and Wright assisted with the litigation, sat for depositions, answered interrogatories, and produced documents. (DE 388-1 at 25). The record does not suggest that there are conflicts of interest between Remache and Wright on the one hand and the members of the proposed class on the other. *See In re Warfarin*, 391 F.3d at 532.

There seems to be no significant issue as to the adequacy and suitability of counsel. Plaintiffs note that their counsel, Outten & Golden LLP and Getman, Sweeney & Dunn, PLLC, have been selected as wage-and-hour class counsel before and that Green Savits, LLC has served as wage-and-hour plaintiffs' counsel. (DE 388-1 at 25–26 & nn.86–88).

The record thus reveals that Remache and Wright are adequate representatives of their proposed class and have selected competent counsel. Plaintiffs have thus satisfied the requirements of Rule 23(a)(4).

### C. Rule 23(b)(3) Requirements

In addition to satisfying the four Rule 23(a) requirements, a plaintiff seeking class certification must satisfy at least one of the three requirements

listed in Rule 23(b). Here, plaintiffs rely on Rule 23(b)(3), which requires (A) "that the questions of law or fact common to class members predominate over any questions affecting only individual members," and (B) that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).[8] Although the requirements are distinct, many considerations are relevant to both, so some overlap in the discussion is unavoidable.

Rule 23(b)(3) sets out a list of four non-exhaustive favors to consider during the predominance and superiority inquiries:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

### 1. Predominance

To be certified as a Rule 23(b)(3) class action, a putative class must demonstrate that "the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). The putative class bears the burden of demonstrating predominance. *See Comcast*, 569 U.S. at 33–34. "If anything, Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)." *Comcast*, 569 U.S. at 34 (citing *Amchem*, 521 U.S. at 623–24 (1997)). Since Rule 23(b)(3) is an "adventuresome innovation," designed for situations in which "class-action treatment is not clearly called for," courts have a duty to take a "close

---

[8]     This Circuit has given prominence to a third element: (C) an independent "ascertainability" inquiry to determine if the class can be defined and determined for the purposes of class litigation. *Byrd*, 784 F.3d at 163. As noted above, this ascertainability factor does not seem to be substantially contested.

look" at whether common questions predominate over individual ones. *Id.* (citing *Dukes*, 564 U.S. at 362).

The predominance analysis may overlap with or resemble a merits inquiry. *See Comcast*, 569 U.S. at 33–34; *Dukes*, 564 U.S. at 351. "The predominance inquiry is especially dependent upon the merits of a plaintiff's claim, since the nature of the evidence that will suffice to resolve a question determines whether the question is common or individual." *In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 780 (3d Cir. 2009) (quotation marks omitted); *see also Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016). The Third Circuit recently explained that courts, in undertaking a predominance inquiry, must look beyond the pleadings:

> In determining whether issues that are "susceptible to generalized, class-wide proof" are "more prevalent or important," a district court is called to "formulate some prediction as to how specific issues will play out . . . in a given case[.]" The court cannot rely on a mere "threshold showing" that a proposed class-wide method of proof is "plausible in theory." Rather, the court's Rule 23(b)(3) finding necessarily entails some analysis of whether the proposed class-wide evidence will actually be sufficient for the class to prevail on the predominant issues in the case. If class-wide evidence is lacking, the court cannot be adequately assured that individualized evidence will not later overwhelm the case and render it unsuitable for class-wide adjudication. This analysis will often resemble a merits determination, in that it relates to plaintiffs' ability to prove the elements of their claims.

*Harnish v. Widener Univ. Sch. of Law*, 833 F.3d 298, 304–05 (3d Cir. 2016) (internal citations omitted).

The predominance analysis may be seen as an extension of the commonality analysis, *see* Section B.2, *supra*, in that it incorporates an assessment of the issue's susceptibility to classwide proof on the merits. *See Reinig v. RBS Citizens, N.A.*, 912 F.3d 115, 127 (3d Cir. 2018) ("Rule 23(b)'s predominance requirement incorporates Rule 23(a)'s commonality requirement . . . ."). Here too, Ecolab's arguments do not withstand the arguments of the motion for class certification, because the questions raised by Plaintiffs' claims,

considered in light of the likely evidence, can be resolved by common, classwide answers.

First, and most simply, the class members share a common legal theory: that Ecolab's classification policy violates the NJWHL. The merits of the case do not concern any other provision of law, and all plaintiffs join the named plaintiffs' NJWHL claim. That of course is not sufficient, but it is a start.

Second, Ecolab's argument that individual issues predominate over common questions is, to a degree, undercut by its own corporate policy of classifying *all* RMs as exempt. In opposing Plaintiffs' certification motion, Ecolab seeks to disprove the predominance of Plaintiffs' claims by illustrating granular differences between various RMs' sales volumes. But at the same time, the company has apparently never viewed any RMs as unique, because it uniformly classifies them all as exempt from the NJWHL's overtime requirements—without ever inquiring into whether the sales aspect of the job is the "principal, main, major or most important duty." *See* 29 C.F.R. § 541.700(a).

Third, the classwide factual issues predominate over individual factual issues, because all of the RMs have similar job descriptions and responsibilities. Every RM is responsible for installing, maintaining, repairing, and reclaiming commercial dishwashers. Each RM is required to respond to emergency service requests within sixty minutes, and Ecolab makes RMs available to its customers twenty-four hours a day, seven days a week. Ecolab also requires all RMs to structure, monitor, record, and track their workflows through a centralized database. Ecolab trains and supervises all of its RMs on a uniform basis—and it trains them separately from employees who are primarily responsible for sales. A commission system, while it may be indicative of a sales position, is not so here. Sales are attributed via commission to RMs without regard to who or what type of employee generated them. Those "sales" are then redistributed annually to create parity in pay, as well as parity in incentive to sell in the first place.

Fourth, as discussed more thoroughly with respect to commonality in Section B.2, *supra*, a preliminary evaluation of the merits of Plaintiffs' claim further weakens Ecolab's position. Ecolab repeatedly notes that each RM takes a different approach to the sales aspect of his or her job. However, the evidence is nevertheless that the sales aspect is subordinate, and that the RM position is primarily service- and repair-oriented. Ecolab rigorously trains its RMs for the service and repair aspects of their positions, and it closely monitors those same details. However, the company does not provide the same structure or impose the same requirements in connection with the sales side of the RM position. Ecolab requires every RM to service dishwashers, both as a matter of routine course and in emergencies. Even the most sales-driven RMs primarily perform these technical services. Indeed, they are required to do so, but there is no evidence that Ecolab requires any RM to make sales. That Ecolab employs a separate, full-time salesforce further suggests that the sales aspect of the RM position is merely incidental, and not the primary duty. Accordingly, to the extent that the merits present individualized inquiries into various RMs' sales practices, those inquiries are overshadowed by the classwide issue of Ecolab's misclassification, and the evidence shows that those classwide issues predominate.

### 2. Superiority

Certification under Rule 23(b)(3) also requires that a putative class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The superiority inquiry "asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative methods of adjudication." *In re Prudential*, 148 F.3d at 316 (internal quotations omitted). This requirement is met when "a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." Fed. R. Civ. P. 23(b)(3) advisory committee's notes (1996 amendment, subdivision (b)(3)).

Plaintiffs have shown that a class action is the superior form of adjudication. From a cost perspective, this case presents a paradigmatic example of the advantages of class litigation. Wage-and-hour disputes are often not cost-effective to pursue individually, as each employee's claim is likely to be modest. Many plaintiffs lack the resources to federally litigate such a case. The case at hand concerns a single defendant, alleged by approximately one hundred plaintiffs to have violated a single statutory provision. Requiring individual lawsuits would not serve the RMs' individual interests, because their identical claims are susceptible to class-wide resolution, with the economies of scale that such resolution implies.

Moreover, it does not appear that any member of the proposed class has litigated this issue in any other forum. The District of New Jersey is an ideal forum, because the dispute concerns an interpretation of New Jersey state law brought by a class of New Jersey residents against an out-of-state defendant. In fact, Judge Matsumoto reached the same conclusion when she transferred the case here from the Eastern District of New York. (DE 341 at 19–20) ("[T]he factors slightly favor transfer to the District of New Jersey. Of the nine factors, three are neutral and six weigh in favor of transfer. Although some of the six in favor of transfer only minimally point in that direction, among those six are the more important factors, such as the locus of operative facts and the convenience of witnesses."). Finally, the class is not likely to prove unmanageable, because there is a discrete and identifiable number of plaintiffs (approximately 106), and that number is not so large as to present administrative difficulties. The identities of the class members should be obtainable from Ecolab's employment records. A class action is thus the superior method of disposing of this case.

### 3. Ascertainability

In the Third Circuit, Rule 23(b)(3) certification requires an independent determination that (1) the class is "defined with reference to objective criteria"; and (2) there is "a reliable and administratively feasible mechanism for

30

determining whether putative class members fall within the class definition." *Byrd*, 784 F.3d at 163 (citing *Hayes*, 725 F.3d at 355).

Ecolab contests the ascertainability of the class only in a footnote, arguing that "the proposed class definition is not ascertainable. It includes individuals in unidentified positions and requires determination of whether an individual 'regularly performed' certain tasks." (DE 393 at 30 n.113). Ecolab advances no other argument on this point. Despite these protestations, the class is ascertainable for the reasons already state. It has been identified and is defined with reference to objective criteria: Ecolab has produced to Plaintiffs the list of RMs who are among the proposed class members, (DE 388-8), and Plaintiffs have produced a proposed Rule 23 notice (DE 388-46). It appears that the class is not merely ascertainable, but ascertained.

## IV.    CONCLUSION

After a thorough analysis of the Rule 23(a) and 23(b)(3) requirements, I **GRANT** Plaintiffs' motion for class certification.

A separate order will issue.

Dated: December 17, 2019

**Hon. Kevin McNulty**
**United States District Judge**